Lisa PETROSINO, Plaintiff–Appellant,

v.

BELL ATLANTIC, Defendant–Appellee.

Docket Nos. 03–7366, 03–7708.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 11, 2004.

Decided: Sept. 29, 2004.

Adrienne R. Baranoff, Decker & Decker, Staten Island, NY, for Plaintiff–Appellant.

Michael A. Kalish (Deborah S. Markowitz, on the brief), Epstein Becker & Green, P.C., New York City, for Defendant–Appellee.

Julie L. Gantz (Eric S. Dreiband, General Counsel; Carolyn L. Wheeler, Acting Associate General Counsel; Vincent J. Blackwood, Assistant General Counsel, on the brief), U.S. Equal Employment Opportunity Commission, Washington, DC, for amicus curiae Equal Employment Opportunity Commission.

Before: JACOBS, SACK, and RAGGI, Circuit Judges.

RAGGI, Circuit Judge.

Plaintiff–Appellant Lisa Petrosino appeals from an order of the United States District Court for the Eastern District of New York (John Gleeson, *Judge*) entered March 24, 2003, granting summary judgment to Defendant–Appellee Bell Atlantic[1] on Petrosino's claims of sex discrimination in the form of a hostile work environment, a failure to promote, and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 296, and the New York City Administrative Code, N.Y. City Admin. Code § 8–107. *See Petrosino v. Bell Atlantic,* No. 99 CV 4072(JG), 2003 WL 1622885 (E.D.N.Y. Mar.20, 2003). The Equal Employment Opportunity Commission ("EEOC"), appearing as *amicus curiae,* submits a brief in support of Petrosino's challenge to the district court's dismissal of her hostile work environment claim. Petrosino herself further appeals the district court's order entered June 27, 2003, denying her motion for relief from judgment based on newly discovered evidence, *see* Fed.R.Civ.P. 60(b), and for sanctions based on Bell Atlantic's alleged failure to disclose the evidence in pre-trial discovery, *see* Fed.R.Civ.P. 37. For the reasons explained below, we affirm the district court's grant of summary judgment as to Petrosino's promotion and discharge claims, but we reverse the award as to the hostile work environment claim. We further affirm the district court's denial of sanctions and vacate its denial of Rule 60(b) relief, that motion being rendered moot by our partial reversal of summary judgment. The case is remanded to the district court for further proceedings consistent with this opinion.

---

1. Although defendant is now "Verizon," we continue to refer to it throughout this opinion by the name under which it was sued, "Bell Atlantic."

## Background

### I. Petrosino's Employment at Bell Atlantic

From September 1990 until February 1999, Lisa Petrosino was employed by Bell Atlantic as an Installation and Repairs ("I & R") technician at its Edgewater Garage on Staten Island, New York. For the last seven years of her employment, she was the only female I & R technician at the Edgewater Garage. Petrosino's work consisted of installing and repairing residential and commercial telephone systems, cables, and support systems on Staten Island, both within buildings and on telephone poles. Each morning, Petrosino and her co-workers would meet at the garage with their supervisors for approximately half an hour, during which time they received the day's assignments. Occasional interaction with co-workers and supervisors would also occur throughout the day.

### A. The Hostile Work Environment

Petrosino asserts that throughout her employment at Bell Atlantic's Edgewater Garage, she was subjected to a work environment hostile to women. The hostility took two forms: (1) persistent sexually offensive remarks and sexual graffiti that conveyed a low regard for women, and (2) specific comments or actions toward Petrosino that made plain that this negative view of women extended to her and to her work performance.

### 1. The General Work Atmosphere

Petrosino has adduced evidence demonstrating that the work environment at the Edgewater Garage was more reminiscent of a locker room than a place of business.[2] Profanity was commonplace, and crude humor was routine. But the focus of Petrosino's complaint is not on this conduct but on the sexually demeaning conversations that were also an accepted part of the daily work environment. Although male co-workers often insulted each other in these exchanges, the substance of their remarks always conveyed a profound disrespect for women.[3] Further, when working outdoors, Petrosino would constantly confront crude sexual graffiti scrawled by co-workers inside terminal boxes. Among the images depicted were headless women with their legs in the air, women's legs wide open, men with their penises out, and men having sex with animals. A further theme of the graffiti was that Bell Atlantic employees (male and female) performed sex acts on supervisors to advance their careers.

### 2. Gender–Based Comments Directed Toward Petrosino

Petrosino's co-workers made plain that she was not exempted from the generally low view of women communicated by the sexually offensive garage banter and terminal-box graffiti. A few months after she began working at Bell Atlantic, at a De-

---

2. We recognize that Bell Atlantic has adduced considerable contrary or mitigating evidence with respect to Petrosino's version of events, but on this appeal from an award of summary judgment we are, of course, obliged to view the facts in the light most favorable to Petrosino and to assume that all factual disputes would be resolved in her favor at trial.

3. For example, male workers would insult each other by making vulgar claims about their imagined sexual exploitation of each other's wives. See Petrosino Dep., Mar. 30, 2000 (hereinafter "Petrosino Dep. II"), at 463–64 ("[Y]our wife couldn't answer the phone last night because my balls were on her chin."; "Your wife left her panties next to my bed after I fucked her all night until she screamed."). Although the record is replete with variations on this theme, we think these examples suffice to convey the tenor of the remarks at issue.

cember 1990 Christmas party, Petrosino was physically attacked from behind in a parking lot by co-worker Charles Degenhardt, who groped and kissed her. When Petrosino shouted for help, other employees pulled Degenhardt away, but for months thereafter, the incident was a "big joke" at the garage and the subject of terminal-box graffiti. Petrosino Dep., July 20, 2001 (hereinafter "Petrosino Dep. III"), at 35.[4] In the ensuing years, frequent disparaging remarks were made with reference to Petrosino's "ass," her "tits," her menstrual cycle, her weight, and her eating habits, and at least one terminal-box drawing depicted her performing a sex act on a supervisor. Further, the disparagement was not limited to private exchanges, but extended to supervisors' comments relating to her job performance.

For example, Petrosino's direct supervisor from 1990 to 1992, Robert Sharib, punctuated his conversations with her with hostile gender-based comments, referring to Petrosino as "a damn woman," Petrosino Dep., Mar. 15, 2000 (hereinafter "Petrosino Dep. I"), at 278, telling her to calm her "big tits down," Petrosino Aff. ¶ 18, and dismissing her job concerns as attributable to her menstrual cycle, *see id.* ("He accused me several times of being 'on the rag' . . . whenever I had a dispute with him . . . ."). On one occasion, Sharib humiliated Petrosino by taking a doctor's note that she had brought to work, enlarging it to poster size, and displaying it in the office.

Petrosino also points to gender-hostile remarks by Tom Archdecon, her second— and third-level manager throughout her employment at Bell Atlantic. In discussions with Petrosino about her work, Archdecon not only told her that as an individu-

al, she was "too thin-skinned" to belong in her work assignment, he cast this observation "all the time" in gender-wide terms, stating that women as a group were too "simple," "too sensitive," and "too damn thin-skinned" to work at the garage. Petrosino Dep. I, at 277–79. Over the years, several first-level managers told Petrosino that she would never be permitted to assume managerial responsibilities as long as Archdecon was an I & R supervisor. *See infra* at [11–12].

Archdecon's gender hostility toward Petrosino was echoed by Frank Mangiero, Petrosino's direct supervisor from 1996 to 1997. On "many occasions," he called her "a damn woman" and told her that if she could not handle working in I & R, "maybe women can't handle it." Petrosino Dep. II, at 502. In front of Petrosino's male co-workers, he also linked her work deportment to her menstrual cycle, telling her: "Don't give me a hard time just because you're on the rag." Petrosino Dep. III, at 40. Mangiero repeatedly cited Petrosino for minor job infractions, such as using a company vehicle to get coffee for another supervisor and playing her truck radio too loudly, without similarly reporting male employees. He made her repeat tasks unnecessarily. On one occasion, he refused Petrosino's request to use a bucket truck to perform an assignment safely, only to allow a male worker to use the truck when the task was reassigned to him.

### 3. *Petrosino's Complaints of Harassment*

Petrosino asserts that throughout her employment she complained informally and formally about the gender-hostile envi-

---

**4.** Petrosino ascribes no further sexual misconduct to Degenhardt who, sometime in 1995– 96, became her direct supervisor.

ronment at the Edgewater Garage. For example, she repeatedly told co-workers and supervisors that she found the constant sexual banter at the garage offensive and demeaning, but no steps were ever taken to address the problem. To the contrary, offending workers ridiculed her concerns by offering sarcastic apologies, only to persist thereafter in their vulgar exchanges.

In 1992, Petrosino filed a labor grievance charging Robert Sharib with harassment.[5] Although she prevailed, she asserts no actual discipline was imposed. Instead, Sharib and Petrosino were sent to a seminar to help them work out their differences. When Petrosino attempted to use the opportunity to voice her concerns, Sharib told her: "Just keep your mouth shut and do what I tell you." Petrosino Dep. I, at 206. Petrosino complained about this comment to a senior manager, who offered to transfer her to Brooklyn, and assured her she would have no further problems. Soon after Petrosino declined the transfer offer, Sharib scolded her for going over his head and warned her never to do that again. He then relieved her of responsibilities that would have prepared her for a future management position.[6]

Sometime in 1997 or 1998, a female administrative manager asked Petrosino why she no longer worked overtime. Petrosino explained that she avoided overtime to "stay away" from her then-supervisor, Mangiero, who "harrasse[d her] and bother[ed her]." Petrosino Dep. III, at 70–71.

Petrosino asserts that no one at Bell Atlantic pursued the matter. Some months later, in May 1997, Petrosino called Bell Atlantic's Ethics Hotline to complain formally that Mangiero harassed her because she was the only female in his group. Petrosino's request to discuss her concerns with a female counselor were rebuffed, and no one from Bell Atlantic ever followed up on this complaint.[7]

### B. The Failure to Promote Petrosino

In addition to being subjected to a gender-hostile environment, Petrosino asserts that she was denied promotion opportunities at the Edgewater Garage because she was a woman.

#### 1. The Promotion Practice at the Edgewater Garage

The record reveals that a relatively complex but informal system of promotion operated at the Edgewater Garage. In addition to official supervisory positions (e.g., first-level manager, second-level manager, etc.), there were two types of "acting" manager positions: "temporary" acting managers who filled in for supervisors who were out of the office for a few days or weeks and "permanent" acting managers who supervised a team of workers on a long-term basis but who were not yet official managers (usually because of budgetary and bureaucratic delays). Selection as an official manager was generally contingent on having performed successfully as a permanent acting manager for the same

---

5. Petrosino asserts that she originally complained of sexual harassment by Sharib, but at a union representative's suggestion, her formal charge read simply "harassment." No records of these proceedings are before the court.

6. Soon thereafter, Sharib resigned from Bell Atlantic. Apparently, Petrosino never complained, either before or after Sharib's resig-

nation, about his actions in relieving her of any work responsibilities.

7. Contemporaneous notes in the Ethics Hotline file suggest that Petrosino failed to return a number of telephone calls pertaining to her complaint, but for purposes of this motion, we must assume that a factfinder would resolve this factual dispute, like all others, in favor of Petrosino.

position. Further, permanent acting managers were usually selected from persons who had previously served as temporary acting managers.

Until 1998, Bell Atlantic maintained no formal system for listing available official or acting manager positions. Workers would express their interest in a position to a supervisor who would then present their names to a promotions committee. In 1998, Bell Atlantic instituted the "departmental interview system" to formalize the promotion process. Under this system, job openings were posted where all employees could see them, and employees could apply directly (rather than through their supervisors) for a listed position by submitting a formal written application form and undergoing an interview. According to Petrosino, this system was never fully implemented at the Edgewater Garage. Indeed, she and some of her coworkers profess never to have heard of the system. Moreover, one I & R supervisor conceded that he never used the system in making promotions, and another acknowledged that, despite the system, managers continued "grooming" favored candidates for particular promotions.

### 2. Petrosino's Requests for Promotion

As already noted, in 1992, Petrosino was performing job responsibilities that might have assisted her in receiving a future managerial promotion. She was relieved of those responsibilities by her then-supervisor, Robert Sharib, after she charged him with harassment.

Sometime in 1995 or 1996, Petrosino expressed an interest in a managerial promotion to her then-supervisor Charles Degenhardt (the same individual involved in the December 1990 assault). Soon thereafter, Degenhardt asked Petrosino if she

would be interested in serving as a temporary acting supervisor when he was out, and Petrosino enthusiastically agreed. The following morning, when Petrosino arrived for work at the usual time, Degenhardt informed her that she had just missed the training class for acting supervisors. Petrosino asserts that she was never told about such a training class, much less one scheduled outside normal work hours. When the missed-class scenario repeated itself the next day, Petrosino concluded that Degenhardt was playing a joke at her expense, that he never intended her to serve as acting supervisor, and that he was simply ridiculing her managerial aspirations.

On various occasions in 1997, 1998 and 1999, Petrosino repeated her interest in becoming a manager to supervisors Joseph D'Angelo, Frank Mangiero, William DeLeon, and Michael Russo. Each told her that she should forget that idea as long as Tom Archdecon was an I & R supervisor. *E.g.*, Petrosino Dep. I, at 276–77 ("Joe D'Angelo said ... 'Tom [Archdecon] will never let you act.'"); Petrosino Dep. II, at 606 ("Frank Mangiero, Will DeLeon told me as long as Tom [Archdecon] is around, I didn't stand a chance.... Mike Russo also told me the same thing, that as long as Tom is around, I don't stand a chance.").

When, in the summer of 1998, it was rumored that Archdecon was leaving I & R, Petrosino approached Russo, then her second-level supervisor, and reiterated her interest in an acting manager assignment. Russo agreed to sponsor her, and by October 1998, Petrosino was serving short stints as a temporary acting manager, substituting as an administrative foreman for Cathy Hopkins, and as a field foreman for her first-level supervisor DeLeon.[8]

8. Asked at deposition if she felt that she was "getting somewhere," Petrosino replied: "Ab-

## C. Constructive Discharge

A few months later, on February 10, 1999, Petrosino resigned from Bell Atlantic. She submits that she was constructively discharged because events in the preceding month had rendered her already-difficult work situation intolerable.

In January 1999, Petrosino spoke with Russo about a canvas seeking technicians to transfer to the Cable Maintenance ("CX & M") department and asked him about the likelihood of her receiving a permanent acting supervisor promotion anytime in the near future in I & R. Russo told her that he did not anticipate any such openings because the I & R managers were all relatively young. He suggested she might do better in CX & M because the managers in that department were older. When Petrosino asked DeLeon his views, he told her that she should go to CX & M because she would not receive a promotion while Archdecon was in I & R. Petrosino asserts that she volunteered for a transfer, relying on these supervisors' advice, and was accepted.

Around the same time, Petrosino also spoke with a CX & M supervisor about her interest in a managerial promotion. The supervisor told her that a number of people in CX & M were already serving as acting managers and being groomed for future permanent positions. Thus, Petrosino would likely have to work in the department for at least one year before being considered for a managerial assignment. He did, however, report the possibility that a new "gang" might be created at CX & M.[9]

Meanwhile, Petrosino discovered that for the remainder of her time in I & R—she asserts the formal transfer process could have taken several months—DeLeon did not intend to assign her as his temporary acting manager. He explained that it would be unfair to those remaining in I & R to have someone who was leaving the department serve in this capacity. Accordingly, he began to train Mike Martine as temporary acting foreman. Martine had also volunteered for a CX & M transfer, but, unlike Petrosino, he was not yet formally scheduled for reassignment.[10]

Petrosino concluded that her situation was untenable: because she was scheduled to transfer to CX & M, she was no longer eligible for temporary acting manager assignments at I & R; but she was unlikely to be considered for promotion at CX & M for more than a year. Confronting this dilemma, she made no inquiry as to whether she could decline the CX & M transfer, remain in I & R, and continue to receive temporary supervisor assignments in that department. Instead, she simply resigned from Bell Atlantic.

## II. Procedural History

After filing a complaint with the EEOC on April 13, 1999, charging Bell Atlantic with employment discrimination and receiving a "right to sue" letter, Petrosino filed this action in the United States District Court for the Eastern District of New York on July 26, 1999.

---

solutely." Petrosino Dep. I, at 310.

9. Apparently, technicians in both I & R and CX & M were organized into "gangs" headed by a supervising foreman. Petrosino testified that in 1998, there were four such gangs at I & R and one gang at CX & M.

10. Petrosino notes that some years later, when Martine transferred from I & R to Bell Atlantic's Air department, he continued to serve as DeLeon's temporary acting manager up until the time of his departure. But the point appears to be of no relevance because the record indicates that his transfer, unlike hers, was effective almost immediately.

## A. *The District Court's Award of Summary Judgment to Bell Atlantic*

On August 2, 2002, Bell Atlantic moved for summary judgment. In a memorandum and order dated March 20, 2003, the district court granted the motion. It concluded that Petrosino had failed to adduce sufficient evidence of "severe or pervasive" harassment based on gender to support a hostile work environment claim. *Petrosino v. Bell Atlantic,* 2003 WL 1622885, at *6. The district court further concluded that Petrosino's failure to identify a specific managerial position for which she applied and was rejected necessarily precluded her from pursuing a discriminatory promotion claim. *See id.* at *8. Finally, the district court concluded that Petrosino could not succeed on a constructive discharge claim because she had failed to adduce evidence from which a jury could conclude that Bell Atlantic had intentionally rendered her work conditions intolerable. *See id.* at *11.

## B. *The Denial of the Motions Pursuant to Fed.R.Civ.P. 37 and 60(b)*

Petrosino moved pursuant to Fed. R.Civ.P. 60(b) to be relieved from the award of summary judgment based on newly discovered evidence that Bell Atlantic failed to disclose in response to a discovery demand. She requested sanctions pursuant to Fed.R.Civ.P. 37 based on the alleged misconduct in discovery. We briefly outline the facts pertinent to these motions.

During pre-trial discovery, Petrosino served interrogatories on Bell Atlantic, requesting, *inter alia,* information regarding other sexual harassment suits or complaints. *See* Interrogatory No. 22 ("Has any employee [of Bell Atlantic] ever filed [a] ... complaint ... or lawsuit alleging that [Bell Atlantic] discriminated in New York City based on sex?"). Bell Atlantic's response, received January 26, 2001, did not disclose the existence of a New York state suit filed by Jeanne–Marie Tisi, a Bell Atlantic employee, who, since May 1999, had worked on Staten Island in Petrosino's former department. Tisi's complaint also charges Bell Atlantic with sexual harassment in maintaining a gender-hostile work environment.

The district court denied Petrosino's Rule 60(b) motion concluding that the new evidence was neither admissible nor likely to have produced a different result. It also denied sanctions finding that the information fell outside the general temporal limits of the discovery requests.

## *Discussion*

### I. *Standard of Review*

We review the district court's award of summary judgment *de novo, see Mack v. Otis Elevator Co.,* 326 F.3d 116, 119 (2d Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 562, 157 L.Ed.2d 428 (2003), resolving all factual ambiguities and crediting all inferences, including those relating to credibility, in favor of Petrosino, *see Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir. 2001). We will affirm the award only if " 'there is no genuine issue as to any material fact,' " and if Bell Atlantic " 'is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c)).

### II. *Statute of Limitations*

An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act. *See Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130, 133 (2d Cir.2003) (citing 42 U.S.C. § 2000e–5(e)). Petrosino filed her discrimination charge with the EEOC on April 13, 1999; thus, the limitations period in her case began 300 days earlier, on June 17, 1998.

■ When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300–day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct. For example, in the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider "the entire time period of the hostile environment" in determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Because Petrosino does point to some allegedly gender-hostile actions occurring after June 17, 1998, the district court correctly found her hostile work environment claim timely and properly considered earlier events dating back to 1990 in support of this claim. We will do the same.

Other Title VII claims, such as those for termination or failure to promote, are based on "discrete acts," each giving rise to a separate cause of action. *Id.* at 114, 122 S.Ct. 2061. The law is clear that termination and promotion claims may not be based on discrete acts falling outside the limitations period. *Id.* No timeliness concerns arise with respect to Petrosino's termination claim because it is based on a single event, her alleged constructive discharge on February 10, 1999, which falls well within the limitations period. With respect to her claim of persistent promotion denials throughout her Bell Atlantic employment, however, Petrosino can sue only for denials occurring after June 17, 1998. Nevertheless, evidence of earlier promotion denials may constitute relevant "background evidence in support of a time-

ly claim," and we will consider it as such. *Id.* at 113, 122 S.Ct. 2061; *accord Bonner v. Guccione*, 178 F.3d 581, 599 (2d Cir. 1999) (citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)).

### III. *The Claims of Gender Discrimination*

Title VII of the Civil Rights Act of 1964 states: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a).[11] The purpose of this provision is to prevent "disparate treatment of men and women in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted). Petrosino asserts that she was the victim of three forms of sex discrimination: (1) she was subjected to a hostile work environment amounting to sexual harassment, (2) she was denied promotion opportunities, and (3) she was constructively discharged. We examine each of these claims in turn.

### A. *Hostile Work Environment*

■ In *Meritor Savings Bank, FSB v. Vinson*, the Supreme Court made plain that Title VII's prohibition of sex discrimination extends to sexual harassment. 477 U.S. at 63–68, 106 S.Ct. 2399. "[S]exual harassment includes 'conduct [that] has the purpose or effect of unreasonably interfering with an individual's work per-

---

**11.** Because Petrosino's employment discrimination claims under state and municipal law are governed by the same standard as her Title VII claims, we need not discuss them separately. *See Mack v. Otis Elevator Co.*, 326 F.3d at 122 n. 2. Our rulings as to the federal discrimination claims pertain equally to the state and local claims.

formance or creating an intimidating, hostile, or offensive working environment.' " *Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001) (quoting 29 C.F.R. § 1604.11(a)). To prevail on a claim of sexual harassment based on a hostile work environment, a plaintiff must establish two elements: " '(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.' " *Mack v. Otis Elevator Co.*, 326 F.3d at 122 (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir.1999)).

### 1. *Petrosino's Work Environment*

■ The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003) (internal quotation marks omitted). In this case, Bell Atlantic does not contest that Petrosino subjectively experienced her work environment as hostile. Thus, we focus on whether Petrosino's work environment could objectively be deemed hostile to women.

The district court concluded that no jury could reasonably find Petrosino's work environment objectively hostile to women. In so ruling, it decided, first, that evidence of incessant sexually offensive exchanges at the daily assignment meeting and omnipresent sexual graffiti in the terminal boxes could not support Petrosino's claim, because this conduct, while "undeniably boorish and offensive," was not "motivated

by hostility toward Petrosino because of her sex." *Petrosino v. Bell Atlantic*, 2003 WL 1622885, at *6–*7. Rather, it applied equally to all employees, male and female. Second, the district court concluded that the remaining alleged incidents of harassment, even when viewed as a whole, were insufficiently severe or pervasive to establish a sexually discriminatory hostile work environment. *See id.* at *7. We disagree.

### a. *Common Exposure of Male and Female Employees to Sexually Offensive Comments and Graffiti*

■ Title VII prohibits "*discrimination]* ... because of ... sex.*" Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (emphasis in original). Thus, a work "environment which is equally harsh for both men and women" cannot support a claim for sex discrimination. *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999); *accord Brown v. Henderson*, 257 F.3d at 253. The mere fact that men and women are both exposed to the same offensive circumstances on the job site, however, does not mean that, as a matter of law, their work conditions are necessarily equally harsh. The objective hostility of a work environment depends on the totality of the circumstances. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Terry v. Ashcroft*, 336 F.3d at 148. Further, the perspective from which the evidence must be assessed is that of a "reasonable person in the plaintiff's position, considering all the circumstances [including] the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 81 (internal quotation marks omitted).

There is some ambiguity in our case law as to whether, in a case such as this, a

"reasonable person in the plaintiff's position" must be a woman or a person drawn from the public at large. *Compare Torres v. Pisano*, 116 F.3d 625, 632 & n. 6 (2d Cir.1997) (assessing challenged conduct from perspective of a "reasonable woman"), *with Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d at 436 n. 3 (rejecting view that reasonable person is limited to members of the plaintiff's protected class).[12] In fact, we need not choose between these two options because we conclude that the evidence in this case, viewed in the light most favorable to Petrosino, would permit a jury to conclude that a reasonable person, regardless of gender, would consider the sexually offensive comments and graffiti here at issue more offensive to women than to men and, therefore, discriminatory based on sex.

■ The comments and graphics that permeated Petrosino's work environment may have sexually ridiculed both men and women, but there is an important, though not surprising, distinction. The conduct at issue sexually ridiculed some men, but it also frequently touted the sexual exploits of others. In short, the insults were directed at certain men, not men as a group. By contrast, the depiction of women in the offensive jokes and graphics was uniformly sexually demeaning and communicated the message that women as a group were available for sexual exploitation by men. Such workplace disparagement of women, repeated day after day over the course of several years without supervisory intervention, stands as a serious impediment to any woman's efforts to deal professionally with her male colleagues.

The fact that much of this offensive material was not directed specifically at Petrosino—indeed, her male co-workers would likely have traded sexual insults every morning and defaced terminal boxes with sexual graffiti regardless of Petrosino's presence in the I & R department— does not, as a matter of law, preclude a jury from finding that the conduct subjected Petrosino to a hostile work environment based on her sex. Indeed, the Fourth Circuit, sitting en banc, recently reached this same conclusion in a case involving a work environment strikingly similar to that alleged by Petrosino: an all-male production shop (except for the female plaintiff) suffused with "sex-laden and sexist talk and conduct." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 332 (4th Cir. 2003) (*en banc*), *cert. denied,* — U.S. ——, 124 S.Ct. 1406, 158 L.Ed.2d 77 and — U.S. ——, 124 S.Ct. 1411, 158 L.Ed.2d 77 (2004). The employer contended that the offensive conduct could not be deemed discriminatory based on sex "because it could have been heard [or seen] by anyone present in the shop and was equally offensive to some of the men." *Id.* (internal quotation marks omitted). The court disagreed, concluding that a jury could find "[m]uch of the conduct ... particularly offensive to women and ... intended to provoke [plaintiff's] reaction as a woman." *Id.* Judge Michael, the author of the en banc decision, had convincingly made this same point in his earlier panel dissent by employing a powerful hypothetical:

> Suppose, for example, that an African-American plaintiff brings a race discrimination claim alleging a hostile work en-

---

12. Noting this dichotomy, our colleague Judge Newman has sensibly suggested that a reasonable person should, at least, mean a reasonable person informed of "how members of the protected class regard the challenged remarks or displays"; otherwise,

"[t]he perspective of the reasonable 'person' might turn out to be the very stereotypical views that Title VII is designed to outlaw in the workplace." *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d at 321 (Newman, J., concurring in part and dissenting in part).

vironment due to his coworkers' daily use of the meanest racial slur against African–Americans. Suppose further that the workplace had previously been all white and that the pattern of racial slurs was the same both before and after the plaintiff's arrival. The majority's reasoning suggests that if the employer could show that none of the racial slurs were directed at the plaintiff and that he would have been exposed to exactly the same language if he had been white, the harassment in this example could not be "because of race." Yet I find it difficult to believe that any court would fail to find race-based harassment in these facts. If the right to be free from a racially hostile work environment means anything at all, surely it includes the right to be free from a workplace permeated by racial slurs.

*Ocheltree v. Scollon Prods., Inc.*, 308 F.3d 351, 376 (4th Cir.2002) (Michael, J., dissenting in part and concurring in the judgment in part), *rev'd en banc*, 335 F.3d 325. We note that this analysis parallels that of Judge Newman who, writing separately in *Brennan v. Metropolitan Opera Association, Inc.*, observed that "[d]isplays of photos of Blacks being lynched or of nude women in sexually provocative poses would not be insulated from Title VII claims simply because the photos were observable by all office employees, White and Black, male and female." 192 F.3d at 320 (Newman, J., concurring in part and dissenting in part). The majority in *Brennan* found it unnecessary to reach this common-exposure issue to resolve that particular case, *see id.* at 319, but we now adopt Judge Newman's reasoning and that of the Fourth Circuit in rejecting Bell Atlantic's argument that the common exposure of male and female workers to sexually offensive material necessarily precludes a woman from relying on such evidence to establish a hostile work environment based on

sex. *See also Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1522–23 (M.D.Fla.1991) (holding that sexually provocative pictures of nude and partially nude women, which were put up before any female employees joined the workplace, had "a disproportionately demeaning impact" on female employees and, as such, "convey[ed] the message that [women] do not belong").

In sum, although all Bell Atlantic employees at the Edgewater Garage were routinely exposed to sexually offensive language and graphics, we conclude that a reasonable jury could find this conduct more demeaning of women than men and, therefore, the evidence should not have been excluded from an assessment of the totality of circumstances in considering Bell Atlantic's motion for summary judgment.

b. *The Severity and Pervasiveness of the Challenged Conduct*

█ In reviewing the totality of the evidence adduced by Petrosino in support of her hostile work environment claim, we are mindful that Title VII does not establish a "general civility code" for the American workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 81, 118 S.Ct. 998. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment. *See id.; Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir.2001). To defeat Bell Atlantic's motion for summary judgment, Petrosino must adduce evidence sufficient to permit a reasonable jury to conclude that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that [was] 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367 (quoting

*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. at 65, 67, 106 S.Ct. 2399); *accord Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000).

As we have already observed, a reasonable jury could conclude that the persistent sexually offensive remarks at the Edgewater Garage and the graffiti at outdoor work sites were particularly insulting to women because these actions cast women in a demeaning role: as objects of sex-based ridicule and subjects for sexual exploitation. It is within this context that the remaining evidence of sexual harassment must be considered. In this light, Petrosino's sexual assault by a drunken co-worker within a few months of joining the I & R department might well be viewed by a reasonable jury not simply as an isolated incident but as a tangible extension of the pervasive demeaning talk to Petrosino personally. The assault communicated to Petrosino that she was perceived, at least by one co-worker, not as a professional colleague, but as one more woman available for sexual exploitation. The fact that for some time thereafter Petrosino's male co-workers treated the assault as a subject for office jokes and graffiti only reinforced this perception.[13] Similarly, the men's sarcastic apologies when Petrosino attempted to limit their sexually offensive exchanges supports an inference that they were deliberately attempting "to provoke [her] reaction as a woman." *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d at 332. Further, the link the men—including supervisors—routinely drew between their perceptions of Petrosino's professional defects and her anatomy, especially their vulgar references to her breasts and menstrual cycle, likewise communicated that her gender would always

stand as a bar to full acceptance within the workplace. Indeed, Petrosino's work concerns were routinely dismissed in gender-based terms: she, like all women, was simply too "thin-skinned" and "sensitive" to work successfully in I & R.

We thus conclude that Bell Atlantic cannot demonstrate from the totality of this evidence that, as a matter of law, no reasonable jury could conclude that the gender-hostile atmosphere at the Edgewater Garage was insufficiently severe and pervasive to support Petrosino's claim of harassment and, therefore, discrimination, based on sex. To the extent the district court concluded otherwise, we reverse.

### 2. *Bell Atlantic's Liability for the Hostile Work Environment*

Because the district court concluded that Bell Atlantic was entitled to summary judgment on the first element of a hostile work environment claim, it did not reach the second element: whether any harassing conduct can fairly be imputed to the employer for purposes of assessing liability. *See Mack v. Otis Elevator Co.,* 326 F.3d at 122. Bell Atlantic submits that, on the record before this court, this question of vicarious liability can be resolved in its favor as a matter of law, thereby providing an alternative ground for affirming the district court's award of summary judgment. In the exercise of our discretion and in the interests of judicial economy, we address this issue, *see Booking v. General Star Mgmt. Co.,* 254 F.3d 414, 418–19 (2d Cir.2001) (recognizing appellate court's discretion to consider issues raised in the district court but not resolved there), and conclude that disputed issues of fact preclude a summary award in favor of Bell Atlantic on the second as well as the first

---

**13.** Absent these links to the pervasive verbal harassment, the assault evidence might be too factually and temporally remote to be relevant to Petrosino's hostile work environment claim.

element of a hostile work environment claim.

■■■■ The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. *See Faragher v. City of Boca Raton,* 524 U.S. at 789; *accord Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 72 (2d Cir.2000). Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, *Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; if it did, "the employer will, *ipso facto,* be vicariously liable," *Mack v. Otis Elevator Co.,* 326 F.3d at 124. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher v. City of Boca Raton,* 524 U.S. at 807, 118 S.Ct. 2275; *Mack v. Otis Elevator Co.,* 326 F.3d at 125.

In this case, Petrosino asserts that Bell Atlantic is automatically vicariously liable for the gender-hostile work environment created by its employees and supervisors because that conduct culminated in two tangible adverse employment actions: her failure to receive managerial promotions and her constructive discharge. *See Pennsylvania State Police v. Suders,* —— U.S. ——, ——, 124 S.Ct. 2342, 2351, 159 L.Ed.2d 204 (2004) (holding that constructive discharge may qualify as a tangible employment action depriving employer of right to assert affirmative defense when "a supervisor's official act precipitates the constructive discharge"); *Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 57 (2d Cir.2004) (observing that a tangible employment action " 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits' " (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257)). Because we affirm the district court's award of summary judgment to Bell Atlantic on Petrosino's promotion and discharge claims, *see infra* part III(B)-(C), a question arises as to whether she can persist in her assertion of automatic vicarious liability on the surviving hostile work environment claim. Mindful that the parties have not had an opportunity to brief this point, we do not attempt to resolve it now. The parties may, however, pursue the matter on remand in the district court.

■■■■ Even if we assume that Bell Atlantic cannot be held automatically liable but can assert an affirmative defense to liability, we nevertheless conclude that the assertion of that defense presents disputed questions of material fact that necessarily

preclude an award of summary judgment with regard to Petrosino's surviving hostile work environment claim. Specifically, to support the "reasonable care" element of the affirmative defense, Bell Atlantic relies on its documented corporate policy against sexual harassment, including its establishment of an Ethics Hotline, which allows employees to report incidents of harassment. Certainly, "[o]ne way for employers to demonstrate that they exercised reasonable care is to show that they had an anti-harassment policy in place," but that fact alone is not "necessarily dispositive." *Mack v. Otis Elevator Co.*, 326 F.3d at 128. In this case, Petrosino does not dispute the existence of Bell Atlantic's complaint hotline, but she does challenge its effectiveness in promptly correcting reported sexual harassment. She asserts that when she telephoned the hotline in May 1997 to complain of gender discrimination by her supervisor Mangiero, her request to discuss her concerns with a female counselor was refused. Thereafter, no one investigated her complaint or took any remedial action. Bell Atlantic disputes this account and produces documentary evidence suggesting that Petrosino failed to return follow-up calls. It further asserts that Petrosino unreasonably failed to pursue her 1997 claim or her other charges of sexual harassment with further calls to the hotline. Bell Atlantic's argument is not without appeal, but on review of a motion for summary judgment, we cannot ourselves resolve the parties' factual disagreement. We are obliged to view the evidence in the light most favorable to Petrosino, which means that we must assume that a factfinder will credit her version of events and conclude that Bell Atlantic failed adequately to investigate and promptly to correct her formal and informal reports of sexual harassment. With that assumption in mind, we cannot conclude as a matter of law that Bell Atlantic has so conclusively

demonstrated the effectiveness of its anti-harassment policy or the unreasonableness of Petrosino's actions to be absolved from liability for any gender-hostile environment created by its employees and supervisors at the Edgewater Garage.

Accordingly, we reverse the award of summary judgment to Bell Atlantic on Petrosino's claim of sexual harassment in the form of a hostile work environment and remand this portion of the case for trial.

### B. *Failure to Promote*

Petrosino complains that throughout her employment with Bell Atlantic she was also unfairly denied promotion based on her sex. As we have already explained, because promotion denials are viewed as discrete acts of discrimination, Petrosino may only sue for events occurring after June 17, 1998. Petrosino's unsuccessful attempts to secure promotion before that date may only be considered as relevant background to the extent Petrosino establishes timely claims.

To establish a *prima facie* case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that: "(1) she is a member of a protected class; (2) she 'applied and was qualified for a job for which the employer was seeking applicants'; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir.1998) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In awarding summary judgment to Bell Atlantic, the district court concluded that Petrosino had failed to satisfy the second element of a *prima facie* case: she did not identify any position within the limitations period for which she

had filed a formal application and was rejected. *Petrosino v. Bell Atlantic,* 2003 WL 1622885, at \*9. On appeal, Petrosino challenges this conclusion, submitting that, under the informal promotion process in effect at the Edgewater Garage, she adequately applied for management positions "by telling her managers that she wanted to be a manager." Appellant's Br. at 45.

 Petrosino's argument is foreclosed by our decision in *Brown v. Coach Stores, Inc.,* 163 F.3d at 710, which emphasizes that the second element of a *prima facie* case cannot be established merely with evidence that a plaintiff generally requested promotion consideration. A specific application is required to "ensure[ ] that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." *Id.* Further, the requirement ensures that the fact finder is not left to speculate as to the qualifications of the competing candidates, the damages to be derived from the salary of unknown jobs, the availability of alternative positions, the plaintiff's willingness to serve in them (e.g., in other locales or on other shifts), etc. The requirement also protects employers from the unfair burden of having "to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply." *Id.* Certainly, the rule is not inflexible. The law recognizes that "the facts of a particular case" may sometimes make "a specific application a quixotic requirement." *Id.* But the exception is narrow and does not pertain simply because an employee asserts that an "aura of discrimination" in the workplace somehow discouraged her from filing a formal application. *Id.* Rather, to be excused from the specific application requirement, an employee must demon-

strate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer. *See id.* at 710 n. 2.

As already noted, the managerial jobs available to Petrosino fit into three categories: official manager, permanent acting manager, and temporary acting manager. There is considerable factual dispute between the parties about how Bell Atlantic employees learned of managerial vacancies and how supervisors filled these positions, even after implementation of the company's "departmental interview" system. Because we must view the evidence in the light most favorable to Petrosino, we assume that many employees, Petrosino included, could not reasonably have known about all available positions through the company's posting policy; that employees often applied for jobs, at least in the first instance, by speaking informally with supervisors; and that Bell Atlantic managers often groomed favored candidates for specific managerial positions. While these facts may satisfy the first prong of the specific application exception, they do not satisfy the second because they do not excuse Petrosino's failure to apply, at least informally, for the *specific* management positions that she knew were vacant in her department. *See id.*

 Focusing first on official manager positions, Petrosino notes that three employees who had served as permanent acting managers (William DeLeon, Richard Mancino, and Louis Lugiero) were named official managers for these same positions in early 1999. Precisely because these positions had been held for some time by persons serving in an acting manager capacity, Petrosino cannot claim that she was unaware of the corresponding official man-

ager vacancies.[14] The only thing she did not know was exactly when Bell Atlantic would make an official appointment. Thus, posting failures may have excused her from filing a timely formal application for these official manager vacancies, but that would not excuse her from informally applying for the positions by telling her supervisors that she wished to be considered for these three official manager openings when Bell Atlantic decided to fill them. Not only has Petrosino failed to adduce any evidence of informal applications for these specific official positions, the evidence she has produced indicates that her informal discussions with supervisors about promotions during the limitations period all pertained to acting manager appointments:

> Q: You asked Mike Russo, you told him you wanted a permanent management position as soon as possible, correct?
>
> A: No. I wanted to act. I didn't say "permanent." I wanted an acting position. I wanted to act. That was my request.
>
> * * * * * *
>
> A: I was shooting low. I wanted to act. I wasn't looking—I didn't ask for a management position. I asked to act.

Petrosino Dep. I., at 317, 323. Thus, we conclude that Petrosino cannot, as a matter of law, pursue a discrimination claim for failure to promote her within the limitations period to an official manager position.

To the extent the evidence viewed most favorably to Petrosino indicates that she informally applied for acting manager positions within the I & R department, we note that she produces no evidence of any permanent acting manager vacancies in I & R within the limitations period. Rather, the appointment of official managers in 1999 appears to have eliminated the need for corresponding permanent acting managers. Thus, Petrosino cannot raise a timely failure to promote claim as to any permanent acting manager position.

■ Insofar as Petrosino sought temporary acting manager assignments, the record indicates that Russo acted favorably on her request. Petrosino was assigned as a temporary acting manager in both administrative and field positions. The crux of her complaint is that she was denied further temporary acting manager assignments in I & R after she was selected for transfer to CX & M. There are sharp disagreements between the parties as to the circumstances relevant to this decision and the inferences that can be drawn therefrom. Even if we assume that these will all be resolved in Petrosino's favor, however, she could not claim that the failure to assign her temporary acting manager responsibilities constituted a denial of promotion. Although the record suggests that temporary acting manager assignments were an important first step for a Bell Atlantic technician who wished to receive a managerial promotion, the assignments themselves did not materially alter the technician's job status. A temporary acting manager received no additional pay or benefits; he or she simply substituted for brief periods when employees who actually held specific managerial positions were on leave or vacation. To the extent Petrosino claims that serving as a temporary acting manager for a supervisor enhanced an employee's chances of succeeding that supervisor as either a permanent acting or official manager, Petrosino

14. As noted earlier, Petrosino states that there were only four first-level I & R supervisors at the Edgewater Garage.

knew that her transfer to CX & M would reduce her chances of succeeding an I & R manager. Thus, she cannot claim that the inability to serve as a temporary acting manager in I & R while she awaited transfer compromised any reasonable succession expectations.

▮ Like the Fifth Circuit, we conclude that an assignment to substitute for an absent supervisor generally cannot fairly be labeled a promotion. *See Zaffuto v. City of Hammond*, 308 F.3d 485, 493 n. 8 (5th Cir.2002) (rejecting promotion claim by employee denied opportunity to serve as acting shift lieutenant for vacationing supervisor), *amended*, 313 F.3d 879 (5th Cir.2002) (per curiam). Such assignments are plainly distinguishable from acting appointments that fill actual vacancies, which courts recognize as employment actions that can support discriminatory promotion claims. *See, e.g., Singletary v. Dist. of Columbia*, 351 F.3d 519, 524 (D.C.Cir. 2003); *Wardwell v. Sch. Bd. of Palm Beach County*, 786 F.2d 1554, 1556 (11th Cir.1986) (per curiam). This is not to dismiss as irrelevant evidence of possible discrimination in temporary managerial assignments. Such conduct, even if does not involve an employment action that could fairly be deemed a promotion, may nevertheless constitute further evidence of a gender-hostile work environment. Thus, our ruling on Petrosino's promotion claim does not preclude her from offering proof (if otherwise admissible) of her unsuccessful efforts to secure managerial positions throughout her employment at Bell Atlantic in support of her hostile work environment claim.

For the reasons stated, however, we conclude that Petrosino has failed, as a matter of law, to state a claim for discriminatory failure to promote and, accordingly, we affirm this part of the district court's summary judgment award.

### C. *Constructive Discharge*

▮ Petrosino's final Title VII claim is for constructive discharge. As this court has several times observed, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d at 151–52 (and cases cited therein). Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions.

Focusing first on the intent requirement, we recognize that in some constructive discharge cases, plaintiffs have been able to establish that employers acted with the specific intent to prompt employees' resignations. *See, e.g., Kirsch v. Fleet Street Ltd.*, 148 F.3d 149, 161–62 (2d Cir. 1998) (upholding jury finding of constructive discharge where evidence indicated that employer nodded affirmatively when plaintiff suggested that the company was trying to force her to leave); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (holding constructive discharge supported by evidence that supervisor told employer "he would be fired at the end of [a] ... probationary period no matter what he did to improve his allegedly deficient performance"), prompting some district courts in this circuit to conclude that specific intent is necessary to a constructive discharge claim. *See Ternullo v. Reno*, 8 F.Supp.2d 186, 191 (N.D.N.Y. 1998). Certainly, where such evidence exists, the *mens rea* requirement is easily established. Nevertheless, this court has not expressly insisted on proof of specific intent. Deferring decision on the issue in *Whidbee v. Garzarelli Food Specialties, Inc.*, the court observed that if a plaintiff suing for constructive discharge cannot

show specific intent, he or she must at least demonstrate that the employer's actions were "deliberate" and not merely "negligen[t] or ineffective[ ]." 223 F.3d at 74.

Turning to the second inquiry, whether the employer's deliberate actions rendered the employee's work conditions so intolerable as to compel resignation, we note that this issue is assessed objectively by reference to a reasonable person in the employee's position. *See Pennsylvania State Police v. Suders*, 124 S.Ct. at 2351 ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"); *Terry v. Ashcroft*, 336 F.3d at 152 ("[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'") (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996)).

 Applying these principles to Petrosino's case, we conclude that she has failed to adduce sufficient evidence to support a constructive discharge claim. Petrosino asserts that by February 1999, a number of factors had combined to render her already difficult work conditions so intolerable that she was compelled to resign: (1) years of harassment in a work environment hostile to women, including years of being denied promotion opportunities because of her sex; (2) recommendations by her I & R supervisors that she transfer to CX & M to secure better promotion opportunities, when, in fact, no such promotion would be possible for more than a year; and (3) her I & R supervisor's refusal to allow her to serve as a temporary acting manager within I & R in the months pending her formal transfer to CX & M.

For reasons already discussed, we conclude that a reasonable jury could find that throughout her employment at Bell Atlantic, Petrosino experienced a work environment that employees and supervisors made deliberately hostile to women. Nevertheless, she endured this environment for eight years, and she does not suggest that this conduct compelled her resignation. Thus, we consider whether a reasonable jury could find that further deliberate employer actions in early 1999 "ratcheted" the harassment up to "the breaking point" for a reasonable person in Petrosino's situation. *Pennsylvania State Police v. Suders*, 124 S.Ct. at 2355. The record cannot reasonably support such a jury finding.

Preliminarily, we note that Petrosino does not argue, nor does the evidence indicate, that Russo and DeLeon, when responding to her queries about a CX & M transfer, were motivated by any gender bias toward her, or that their specific intent was to put Petrosino in an intolerable situation to prompt her resignation from Bell Atlantic. Neither has she adduced evidence to support her conclusory assertion that these supervisors *deliberately* misled her into thinking that promotion opportunities were better at CX & M than at I & R. The record indicates that Russo told her only that because the men holding supervisory positions at I & R were relatively young, he did not expect any promotion opportunities to open up for Petrosino in that department in the near future; thus, she might have a better chance at CX & M, where supervisors were somewhat older. Petrosino has not demonstrated that Russo's report was untrue. At most, she has shown that soon after this conversation, Bell Atlantic did promote three persons who had long served as permanent acting managers to official managers in the same supervisory positions. But Petrosino's queries to Russo

had not been about official manager promotions; her inquiries in 1998 and early 1999 pertained only to acting manager positions.

Even if we were to assume, despite the lack of evidence, that Russo or DeLeon deliberately misled Petrosino about greater promotion opportunities in CX & M to get her to transfer out of I & R, that would not be the sort of circumstance that would cause a reasonable person to conclude that "quitting was the only way she could extricate herself from ... intolerable conditions." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir.1997). A transfer to CX & M would not, after all, have diminished Petrosino's job title, pay, or seniority as a technician. *Cf. Kirsch v. Fleet Street, Ltd.*, 148 F.3d at 161. It would not have placed her in a more gender-hostile environment. At most, transfer would have delayed her opportunity to be promoted to a managerial position compared to her situation at I & R, but it appears undisputed that the reason for that delay relates to seniority rather than sex. Because the law is clear that a constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title, *see Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir.1993), or even with the failure to receive an anticipated raise, *see Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993), or a bonus after having received one in previous years, *see Chisolm v. Kidder, Peabody Asset Mgmt.*, 966 F.Supp. 218, 228–29 (S.D.N.Y.1997), it is doubtful that a constructive discharge claim can be established by an employee dissatisfied with reduced promotion opportunities, *see, e.g., Neal v. Honeywell, Inc.*, 942 F.Supp. 388, 395 (N.D.Ill.1996) (rejecting constructive discharge claim by whistleblower dissatisfied with transfer offers

because "they were not promotions"). An employee who anticipates little chance of promotion in a particular job may well decide to seek employment elsewhere, but the employee can hardly demonstrate that the job she in fact holds was rendered so intolerable that she was compelled to quit.

Indeed, Petrosino's complaint that her supervisory responsibilities in I & R were reduced pending her transfer to CX & M would not support her constructive discharge claim. In *Pena v. Brattleboro Retreat*, we reversed a jury verdict in favor of a nursing home administrator who claimed that her employer's decision to accelerate transfer of her supervisory authority to her successor compelled her to resign. 702 F.2d 322, 325–26 (2d Cir. 1983). As in this case, there was no evidence that the employer wished the employee to resign her position. Nor did the conduct at issue cause the employee to suffer a loss of pay or change of title. *See id.;see also Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir.1986) (holding that relieving teacher of coaching responsibilities and transferring him to another school did not subject him to conditions "so intolerable that a reasonable person would have felt compelled to resign"); *Chisolm v. Kidder, Peabody Asset Mgmt.*, 966 F.Supp. at 228–29 (upholding arbitrators' decision that employee was not constructively discharged by reduction in responsibilities of less than 20 percent).

In any event, Petrosino has not demonstrated that quitting was the only way out of her transfer dilemma. She acknowledges that she never sought to decline the CX & M transfer or inquire about the possibility of remaining in I & R and continuing to receive temporary supervisory assignments. We do not mean to suggest that this course would have eliminated Petrosino's gender-based concerns with her work environment. But where an employ-

ee has within her power the means to eliminate the added condition that purportedly renders her employment intolerable and fails to pursue that option, she cannot demonstrate that she was compelled to resign.

Accordingly, we affirm the district court's award of summary judgment in favor of Bell Atlantic on the claim of constructive discharge.

### IV. *The Motions to Vacate Judgment and for Sanctions*

Petrosino's final claim is that the district court abused its discretion when it denied her motion to vacate the summary judgment order based on newly discovered evidence, *see* Fed.R.Civ.P. 60(b)(2)-(3), and her motion to sanction Bell Atlantic for its failure to provide complete responses to pre-trial interrogatories that would have disclosed the evidence, *see* Fed.R.Civ.P. 37. In light of our decision reversing in part the district court's summary judgment order and remanding the case for trial, we conclude that the Rule 60(b) motion is moot. Accordingly, we vacate the district court judgment denying that motion. On remand, Petrosino may, of course, move to reopen discovery to explore the matters raised in the Rule 60(b) motion, but we leave it to the sound discretion of the district court whether to grant further discovery.

■ We further find no abuse of discretion in the district court's determination that sanctions are not warranted in this case. *See Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002). Petrosino has not shown, for example, that Bell Atlantic's failure to respond to her interrogatories was done either willfully or in bad faith, *cf. Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1365–67 (2d Cir.1991), or that its omission constituted "a serious or total

failure to respond" to the interrogatories, *Flaks v. Koegel,* 504 F.2d 702, 705 n. 2 (2d Cir.1974).

### *Conclusion*

To summarize, we AFFIRM the district court's award of summary judgment in favor of Bell Atlantic on Petrosino's claims of discriminatory denials of promotion and constructive discharge. Because we conclude that the totality of the evidence, including evidence of sexually offensive comments and graffiti to which all workers were exposed, would permit a reasonable jury to conclude that Petrosino was the victim of sexual harassment based on a gender-hostile work environment, we REVERSE the award of summary judgment in favor of Bell Atlantic on this claim. In light of this reversal, we VACATE the district court's denial of Petrosino's motion for relief from judgment pursuant to Fed. R.Civ.P. 60(b) because the motion is now moot. Nevertheless, we AFFIRM the district court's denial of sanctions pursuant to Fed.R.Civ.P. 37. We REMAND the case to the district court for further proceedings consistent with this opinion.