Brian BEEBE & Bruce Erdreich,
Plaintiffs,

v.

NEW YORK TIMES COMPANY,
Defendant.

No. 09–cv–1090 (JBW).

United States District Court,
E.D. New York.

Oct. 19, 2009.

Jeffrey M. Bernbach, Bernbach Law Firm, White Plains, NY, for Plaintiffs.

Evandro Cristiano Gigante, Neil Abramson, Proskauer Rose LLP, New York, NY, for Defendant.

**MEMORANDUM, ORDER & JUDGMENT**

JACK B. WEINSTEIN, Senior District Judge.

**Table of Contents**

I. Introduction ............................................... 325

II. Facts ...................................................... 326
 A. Plaintiffs' Employment History ......................... 326
 B. Job Posting and Hiring for Delivery Foreman Positions ... 327
 C. Previous Agreements Between Erdreich and The Times ..... 329
 1. April 2008 Overtime Dispute ...................... 329
 2. July 2008 Suspension Dispute ..................... 329

III. Law ....................................................... 329
 A. Summary Judgment ..................................... 329
 B. Choice of Law ......................................... 330
 C. Enforceability of Release Agreements ................... 331
 D. Elements of Prima Facie Case of Discrimination ......... 332
 E. Need to Apply for Position ............................. 333

IV. Application of Law to Facts ............................... 334
 A. Release Agreements ................................... 334
 B. Failure to Establish a Prima Facie Case of Discrimination ... 335
 1. Adverse Employment Action Is Material Issue of Fact ... 335
 2. Specific Application Requirement Is Not Satisfied or Excused ... 336
 3. No Basis for Improper Demotion Claim ............. 337

V. Conclusion ................................................ 337

Appendix A: April 2008 Agreement ............................. 338

Appendix B: July 2008 Agreement .............................. 340

## I. Introduction

Plaintiffs Brian Beebe and Bruce Erdreich allege that defendant, the New York Times Company (hereinafter "The Times"), discriminated against them on the basis of their age. They sue under New York State Human Rights Law, N.Y. Exec. Law §§ 290–301 ("NYSHRL") and New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–101 to 8–131 ("NYCHRL"). Plaintiff Erdreich also alleges violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5–1 to 49 ("NJLAD").

Beebe and Erdreich have been employed by The Times for most of their professional careers. Prior to the alleged discrimination, they were delivery foremen with responsibility for dispatching trucks. They claim wrongful denial of promotion to newly created positions of a special form of delivery foreman—which, it is argued, carried additional duties and benefits compared to their posts at the time. The claimed age discrimination occurred in March 2007, resulting ultimately, through a series of job displacements, in assignment to the job of journeyman.

Both plaintiffs are residents of New Jersey. Compl. ¶¶ 5–6. The Times' principal place of business and headquarters are in New York. *Id.* ¶ 4. Jurisdiction is based on

diversity of citizenship. *See* 28 U.S.C. § 1332(a).

The Times moved to dismiss the complaint. Fed.R.Civ.P. 12(c). It argues that (1) plaintiffs cannot recover for failure to promote to a position they never applied for; (2) plaintiffs could not have been denied a promotion as a matter of law because they already held foreman-level positions; and (3) with respect to plaintiff Erdreich, the right to sue was waived when he entered into two separate release agreements related to other employment disputes in April and July 2008. It also contends that Erdreich's New Jersey state law claims should be dismissed because New York's choice of law rules require application of New York state substantive law.

The motion was converted by the court to one for summary judgment. Argument was heard. Additional documentary evidence and briefs were then received.

Because plaintiffs never sought the positions they claim were wrongfully denied, defendant's motion for summary judgment is granted.

## II. Facts

### A. *Plaintiffs' Employment History*

Brian Beebe is 50 years old. Compl. ¶ 5. He has been employed by The Times for 27 years. Beebe Decl. ¶ 2. He joined the fleet safety office in 1984. *Id.* In 1987, he was promoted from fleet safety clerk to assistant fleet safety manager. *Id.* Since 1997, he has worked at the company's production plant in College Point, New York. *Id.* In 1999, he was promoted to foreman and, in 2001, to fleet safety manager. *Id.* He held that position until February 2006, when the position was eliminated as redundant due to organizational changes. *Id.* ¶¶ 5–7. The Times then designated Beebe to work as a delivery foreman, a position making him responsible for dispatching delivery trucks on the night shift. *Id.* ¶ 7. In February 2008, he was assigned to the lesser position of journeyman. Compl. ¶ 16; Answer ¶ 7.

Bruce Erdreich is 56 years old. Compl. ¶ 6. He has been employed by The Times since 1973, primarily working at the company's printing plaint in Edison, New Jersey. Erdreich Decl. ¶ 2. He held the position of delivery foreman from 2002 until February 2008. *Id.* During his employment, he pursued his interest in the fleet safety component of the plant's operations, taking several fleet safety courses and acquiring practical experience, including accident training and pre-trip and post-trip inspections. *Id.* ¶ 3. In November 2007, Erdreich was transferred to the printing plant facility in College Point, New York. *Id.* ¶ 2. He was made a journeyman in February 2008. *Id.*; Answer ¶ 8. He then applied for and received a position entailing driving a tractor-trailer on delivery runs to Carlstadt, New Jersey, and other locations. Erdreich Decl. ¶ 10.

At the time of the alleged failure-to-promote, plaintiffs held the title of delivery foreman. Job descriptions by The Times for plaintiffs' prior foreman positions included the following:

Manage and direct staff of Delivery Journeymen on a shift basis. Ensure timely and accurate dispatch of product to the various distribution/wholesaler operations we service. Must have the ability to recognize operational issues/problems and be capable of instituting corrective measures where and when needed. Candidate must have demonstrated strong leadership abilities with emphasis on coaching and motivating personnel.

Duties also include some administrative functions such as payroll, computerized spreadsheets and Lotus Notes.

Def.'s Letter, dated Sept. 4, 2009, Exs. A and B.

### B. *Job Posting and Hiring for Delivery Foreman Positions*

In 2006, The Times outsourced fleet-safety functions to a private contractor. Beebe Decl. ¶¶ 5–7; Erdreich Decl. ¶ 3. It announced two "new" delivery foreman positions in January 2007. Beebe Decl. ¶ 8; Erdreich Decl. ¶ 4. A job posting was published on January 22, 2007. It provided the following description of the two positions:

Manage and direct staff of Delivery Journeymen on a shift basis. Ensure timely and accurate dispatch of product to the various distribution/wholesaler operations we service. Must have the ability to recognize operational issues/problems and be capable of instituting corrective measures where and when needed. Candidate must have demonstrated strong leadership abilities with emphasis on coaching and motivating personnel. *Will be required to administer discipline, make recommendations concerning hiring and dismissal, and support the companies['] driver training and fleet safety programs.* Duties also include some administrative functions such as payroll, computerized spreadsheets and lotus notes.

Answer, Ex. A (emphasis added). The italicized language did not appear in the job descriptions for the plaintiffs' delivery foreman positions set out above in Part II.A.

Employees interested in the new delivery foreman positions were required to submit applications by February 12, 2007. *Id.* Both Beebe and Erdreich saw the job posting prior to the submission deadline. Beebe Decl. ¶ 8; Erdreich Decl. ¶ 4. Neither tendered an application. Beebe Decl. ¶ 8; Erdreich Decl. ¶ 4.

On March 25, 2007, The Times announced in a memorandum to staff that the two positions had been filled through the promotion of two Times journeymen, ages 41 and 33. Compl. ¶ 13. It read as follows:

I am pleased to announce the promotion of James Pompey and Timothy Watson to Delivery Foreman in our Department effective March 25, 2007.

In their capacity, not only will they have daily management obligations, but *will also be responsible for commentary rides, follow up accident rides, pre-trip/post-trip inspections, safety training and awareness as certified Driver Trainers.*

Jim has been driving for the Times for more than 20 years and Tim has been doing the dispatch function since 2003. Over the years, they have both demonstrated strong leadership ability, a solid work ethic and a keen ability to effectively communicate with their co-workers. These values and their respect for The Rules of The Road have prepared them to take on this important challenge.

Please join me in wishing both Jim and Tim great success on this well deserved promotion.

Mark E. Coleman

Director Delivery Dept.

Answer, Ex. B (emphasis added).

Plaintiffs claim to have been surprised by this promotion announcement insofar as it elaborated on the fleet safety duties of the new delivery foreman positions. In his sworn declaration, Beebe explains his views of the circumstances surrounding the promotions-*viz.*, that the "new" positions and his position at the time were the same:

Upon reviewing the posting, and in particular the title and responsibilities of the positions, as well as the credentials and experience required for them, I determined that *the position for which [The Times] was soliciting applications*

*was no different from the Delivery Foreman's position I currently held.* Accordingly, I did not apply for the job.

However, some three months later when the positions were awarded ... I learned for the first time, via the written announcement of [the] promotions ... that the positions were in fact markedly different from how they had been portrayed in the job posting. Specifically, per the announcement, beyond the various managerial responsibilities that were common to all foremen's positions in the plant, including mine at the time, the [new] positions ... would center substantively on fleet safety, by placing the two in charge of many of the same programs for which I had been responsible during my many years in Fleet Safety. According to the announcement, in their new positions, Messrs. Pompey and Watson "not only will ... have daily management obligations, but will also be responsible for commentary rides, follow up accident rides, pre-trip/post-trip inspections, safety training and awareness as certified Driver Trainers"—all of which were responsibilities I had previously performed in my Assistant Fleet Safety Manager and Fleet Safety Manager roles. In short, these positions were largely recreations of those former roles of mine.

That that would be the case had been impossible to tell from the description of the positions in the January 2007 job posting, which identified none of the numerous fleet-safety-related responsibilities that would subsequently be presented in the March 2007 announcement as the substantive heart of the positions. Nor did the list of required credentials and experience in the posting in any way specifically implicate fleet safety and thus give any indication that the jobs would be of a fleet-safety nature. The only provision of the posting touching on safety—that reading: "support the companies['] driver training and fleet safety programs"—gave absolutely no clue that the positions would be vested with actual fleet safety responsibilities, since *all* foremen "support the companies['] driver training and fleet safety programs," and to merely "support" those programs is quite different from being directly responsible for and actually administering them, as it turned out these positions would be and do . . . .

Had I known the true nature of the positions, I also would have applied for them as a means of best insulating myself from the downsizing that [The Times] was preparing to undertake at or around the time of the positions' posting . . . .

[T]he fact that [The Times] was going out of its way to recreate fleet safety foreman's positions at the very time it was preparing to downsize its foremen generally was a clear indication that the individuals awarded those positions would not, just a short time after receiving them, be displaced from them.

Beebe Decl. ¶¶ 8–10, 12–13 (first emphasis added).

Erdreich claims to have had a similar understanding of the newly posted positions. He submits that "[h]ad the positions been portrayed accurately in the January 2007 posting, thereby apprising me that the positions were fleet-safety-related in nature, I would have applied for them." Erdreich Decl. ¶ 7.

Soon after the March 2007 promotion announcement, buyouts and demotions among the company's foremen were deemed business necessities. Compl. ¶ 15. The Times contracted with an independent consulting firm to assess 150 printing plant foremen, determining which 90 would remain in their positions and which 60 would be offered a buyout or demoted to the position of journeyman. *Id.* Beebe and

Erdreich were among the employees evaluated; Pompey and Watson, the two men promoted to delivery foreman in March 2007, were, according to plaintiffs, never considered for buyout or demotion. *Id.* ¶ 16. The consulting firm completed the evaluation of the 150 printing plant foremen, assigning low rankings to plaintiffs. *Id.* ¶¶ 15, 17. Both were assigned to journeyman positions in February 2008. *Id.* ¶¶ 7–8, 17.

Plaintiffs contend that The Times' proffered reasons for not promoting them to the newly created delivery foreman positions and for reducing them from foreman to journeyman during the reorganization processes were false and a pretext to conceal age discrimination. The Times responds that neither Beebe nor Erdreich ever applied for the delivery foreman positions, that the positions would not have constituted promotions for them, and that their new assignments were based on legitimate, non-discriminatory reasons.

### C. *Previous Agreements Between Erdreich and The Times*

With respect to Erdreich's claim, The Times argues that two agreements, executed in April 2008 and July 2008 by Erdreich and The Times and involving separate employment-related disputes, preclude him from filing the instant claim. *See* Answer, Exs. C and D (attached as App. A, April 2008 Agreement and App. B, July 2008 Agreement).

#### 1. *April 2008 Overtime Dispute*

The April 2008 Release Agreement ("April Agreement") stemmed from a grievance filed by Erdreich's union, the Newspaper and Mail Deliverers' Union of New York and Vicinity ("Union"), on his behalf. The Union had asserted that Erdreich was owed an overtime guarantee pursuant to a collective bargaining agreement. *See* Erdreich Decl. ¶ 11.

Erdreich signed without consulting an attorney. The agreement clarified the overtime pay scheme for his new position as a tractor-trailer rider on delivery runs and guaranteed Erdreich an additional hour of overtime pay for each shift he worked. *See* App. A ¶ 1; Erdreich Decl. ¶ 12. It provided a waiver of claims as follows: "Erdreich and the Union agree that the foregoing fully and finally settles any and all claims or grievances that *have been or could be filed on Erdreich's behalf.*" *Id.* ¶ 2 (emphasis added). An additional term provided that the "settlement is without precedent to any other claim or grievance of a similar nature and *is not to be cited or referred to in any proceeding except a proceeding to enforce its terms.*" *Id.* ¶ 4 (emphasis added).

#### 2. *July 2008 Suspension Dispute*

A second agreement, executed in July 2008 ("July Agreement"), originated in an incident involving Erdreich's suspension for insubordination. *See* Erdreich Decl. ¶ 14. Following a confrontation about a second run on his delivery route, Erdreich was suspended. *Id.* ¶¶ 14–15. The matter was resolved, with terms memorialized in the July Agreement. *See* App. B ¶ 3; Erdreich Decl. ¶ 16. It stated that it "fully resolves any and all claims that Erdreich or the Union has or may otherwise bring *regarding this matter.*" App. B (emphasis added).

### III. Law

#### A. *Summary Judgment*

The court notified the parties that defendant's motion would be treated as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999). It is warranted when, after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c); *see Anderson*, 477 U.S. at 247–50, 255, 106 S.Ct. 2505.

■ The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir.1996); *see also Delaware & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

■ When determining the sufficiency of claims, a court may consider the pleadings, exhibits, documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit, and other matters subject to judicial notice. *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

### B. *Choice of Law*

■ Where subject matter jurisdiction is based upon diversity and where there is a conflict of substantive laws, a federal court applies the choice of law principles of the forum state. *See Banker v. Nighswander, Martin & Mitchell*, 37 F.3d 866, 871 (2d Cir.1994). New York state choice of law rules thus apply. *Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir.2001).

■ There is a conflict of law with respect to plaintiff Erdreich's claims and related legal arguments. *See Robins v. Max Mara, U.S.A., Inc.*, 923 F.Supp. 460, 464 (S.D.N.Y.1996). Erdreich alleges age discrimination under both the NYSHRL, N.Y. Exec. Law §§ 290–301, and the NJLAD, N.J. Stat. Ann. §§ 10:5–1 to 49. Both states prohibit employers from discharging or discriminating against employees on the basis of specified factors, including age, national origin, and disability. Their statutes differ with respect to the remedies available to successful litigants. Under the NJLAD, a successful plaintiff may recover attorneys' fees and punitive damages from a defendant. *See* N.J. Stat. Ann. § 10:5–27.1; *Levinson v. Prentice–Hall, Inc.*, 868 F.2d 558, 560 (3d Cir.1989). Attorneys' fees and punitive damages are not available under the NYSHRL. *See Thoreson v. Penthouse Int'l, Ltd.*, 80 N.Y.2d 490, 591 N.Y.S.2d 978, 606 N.E.2d 1369, 1372–73 (1992); *Kump v. Xyvision, Inc.*, 733 F.Supp. 554, 562 (E.D.N.Y.1990).

■ Turning to the validity and effect of the April and July settlements between Erdreich and The Times, there is an apparent conflict between applicable New York and New Jersey law. *Compare Swarts v. Sherwin–Williams Co.*, 244 N.J.Super. 170, 581 A.2d 1328, 1331–32 (N.J.Super.Ct.App.Div.1990) (adopting the "totality of the circumstances" test for analysis of waivers) *with Skluth v. United Merchs. & Mfrs., Inc.*, 163 A.D.2d 104, 106, 559 N.Y.S.2d 280 (N.Y.App.Div.1990) (determining validity and effect of waiver based on whether it was "clear and unambiguous" and "knowingly and voluntarily entered into").

■ For tort claims, including those relating to conduct regulation, New York law requires application of the law of the jurisdiction having "the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 484, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (tort action); *Travelers Indem. Co. v. Levy*, 195 A.D.2d 35, 39, 606 N.Y.S.2d 167 (N.Y.App.Div.1993) (stating that "state interest" choice of law analysis applies to cases of conduct regulation as well as tort cases). "[T]he significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684 (1985); *see also Tooker v. Lopez*, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394, 398 (1969); *id.*, 301 N.Y.S.2d 519, 249 N.E.2d at 403–04 (Fuld, C.J., concurring).

■ The Times is headquartered in New York. Beebe, though he is domiciled in New Jersey, was employed at and worked in The Times' New York facility at all relevant times. He brings claims only under New York state law. To the extent there would be any conflict of applicable law, New York would have the greater interest in adjudicating these claims. New York substantive law must apply.

Erdreich resides in New Jersey and worked at The Times' New Jersey facility at the time of the alleged failure to promote. His location of employment was moved to Flushing, New York at or around the time of the February 2008 assignment as a journeyman. His present employment includes delivery runs in New York and New Jersey. The Times argues in favor of application of New York substantive law to Erdreich's claims. Erdreich has indicated that he consents to the application of New York law for all claims. *See* Pl.'s Memo. of Law in Opp'n to Defs.' Mot. for Summ. J. at 2, n. 2; *see also Coraggio v. Time Inc. Magazine Co.*, No. 94–CV–5429, 1995 WL 242047, at *3 (S.D.N.Y. April 26, 1995) (noting that only one state's statute on employment discrimination may apply to a plaintiff's claim).

There is no reason in policy not to accept the parties' agreement on choice of law. Erdreich's claim under the NJLAD is dismissed on consent. Based on the close connection to New York of the evidence and facts relevant to the dispute, that state's law applies to all governing issues, including analysis of the April and July Agreements.

C. *Enforceability of Release Agreements*

■■ New York law provides for the enforceability of release agreements that are "clear and unambiguous on their face and which were knowingly and voluntarily entered into," excluding those made as a result of fraud, duress, or undue influence. *See Skluth*, 163 A.D.2d at 106, 559 N.Y.S.2d 280 (internal quotation marks omitted). A waiver of claims will not be afforded unless there is an " 'explicit, unequivocal statement of a present promise to release [a party] from liability.' " *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir.2001) (applying New York law) (quoting *Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir.1985)).

■ General principles of contract law require consideration of the intent of the parties, as evidenced by the language in the release, provided that language is clear. *See Goode v. Drew Bldg. Supply, Inc.*, 266 A.D.2d 925, 697 N.Y.S.2d 417 (N.Y.App.Div.1999); *Livingston v. Bev–Pak, Inc.*, 112 F.Supp.2d 242, 249–50 (N.D.N.Y.2000). The agreement "is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated

agreement." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir. 2000) (internal quotation marks omitted) (applying New York law).

■ To determine whether a waiver is executed knowingly and voluntarily, courts may examine a number of factors, including:

> (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by or consulted with an attorney; and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract law.

*Zveiter v. Brazilian Nat'l Superintendency of Merch. Marine*, 833 F.Supp. 1089, 1097 (S.D.N.Y.1993); *see also Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1420–21 (S.D.N.Y.1989).

■ Because the "law looks with disfavor upon agreements intended to absolve a party from the consequences of [its] wrongdoing, a release which purports to excuse a party from responsibility for misconduct is subject to the closest of judicial scrutiny." *Golden Pac. Bancorp*, 273 F.3d at 515 (internal quotation marks and alterations omitted) (quoting *Abramowitz v. N.Y. Univ. Dental Ctr. Coll. of Dentistry*, 110 A.D.2d 343, 345, 494 N.Y.S.2d 721 (N.Y.App.Div.1985)).

■ No claim is asserted under the Age Discrimination in Employment Act of 1967 (ADEA), which, as amended in 1990, sets strict requirements for a finding that a waiver of a prospective plaintiff's right to sue based on age discrimination was "knowing and voluntary." 29 U.S.C. § 626(f)(1) (enumerating several necessary conditions for enforcement of such waiver,

including that it be written in a manner calculated to be understood, that advice to consult an attorney be provided in writing prior to executing the waiver, that the individual be given at least 21 days to consider the agreement, and other formal requirements). Under the federal law, any waiver of claims must "*specifically refer*[ ] to rights or claims arising under" the ADEA to be considered knowing and voluntary. 29 U.S.C. § 626(f)(1)(B) (emphasis added). But "where the only claims in the ... complaint are based on state law, the Court must apply general principles of New York State contract law when making a determination of whether to enforce the applicable" waiver of claims. *Lambertson v. Kerry Ingredients, Inc.*, 50 F.Supp.2d 163, 168 (E.D.N.Y.1999).

### D. Elements of Prima Facie Case of Discrimination

■ A plaintiff bears the initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir.2001). The NYCHRL and the NYSHRL include the same requirements to satisfy this burden as Title VII claims of employment discrimination brought under federal law. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Jimenez v. City of New York*, 605 F.Supp.2d 485, 497 (S.D.N.Y.2009).

■ Evidence of the following four elements must be presented: "(1) [plaintiff] is a member of a protected class; (2)[he] 'applied and was qualified for a job for which the employer was seeking applicants'; (3)[he] was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir.1998) (quoting *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000) (citing *McDonnell Douglas* ). Excusal from the specific application requirement included in the second element may be granted in limited circumstances, as noted below.

The plaintiffs' burden at the summary judgment stage is *de minimis;* the requirement of meeting this burden "is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001) (internal quotation marks and citations omitted); *see also Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir. 1998).

### E. *Need to Apply for Position*

 Central to the present controversy is whether plaintiffs satisfy the second element, known as the specific application requirement: A plaintiff alleging employment discrimination must, with limited exceptions, establish that he "applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also Petrosino v. Bell Atl.,* 385 F.3d 210, 227 (2d Cir.2004).

 The Court of Appeals for the Second Circuit has ruled that to state a prima facie case for failure to promote, the employee is required to make "some specific effort to apply for a particular position" if he is aware of the position. *See Brown,* 163 F.3d at 710; *see also Petrosino,* 385 F.3d at 227 (affirming grant of summary judgment in favor of defendant where plaintiff failed to identify any position for which she specifically applied); *Wong v. Kings County Dist. Attorney's Office,* No. 02–CV–3740, 2004 WL 692165,

at *4 (E.D.N.Y. Mar. 31, 2004) (holding that a plaintiff who does not make a specific effort to apply for a particular position cannot claim discrimination since "an employer cannot fairly be penalized for failing to divine an employee's unexpressed hopes and desires," and noting that it "does not ask too much of an employee to require that he or she express, in words or substance, 'I want the job,' as a condition for bringing a discrimination action"). The specific application requirement serves to protect employers from unfairly having "to keep track of all employees who have generally expressed an interest in promotion and [to] consider each of them for any opening for which they are qualified but did not specifically apply." *See Brown,* 163 F.3d at 710. This element is not satisfied with evidence only of a general request to be considered for promotions. *Id.*

 A plaintiff may be excused from the specific application requirement if he was unaware of the position or promotion opportunity. *See Mauro v. S. New England Telecomms., Inc.,* 208 F.3d 384, 387 (2d Cir.2000). The "requirement does not apply where ... the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them." *Id.* He may be relieved of the burden of showing he applied for the promotion at issue if it is demonstrated that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino,* 385 F.3d at 227.

 Excusal from the specific application requirement depends upon the context and a realistic assessment of reasonableness under the circumstances. *See, e.g., Howe v. Town of Hempstead,* No. 04–CV–

656, 2006 WL 3095819, at *6 (E.D.N.Y. Oct. 30, 2006) (excusing plaintiff from specific application requirement where plaintiff informally expressed interest and "repeatedly requested a promotion"); *Roberti v. Schroder Inv. Mgmt. N. Am., Inc.*, No. 04–CV2404, 2006 WL 647718, at *5–6 (S.D.N.Y. Mar. 14, 2006) (excusing plaintiff from specific application requirement where plaintiff was "told of vacancies . . . only after the male replacement candidates had been selected"). The circumstances of a case may make "a specific application a quixotic requirement." *Petrosino*, 385 F.3d at 227 (quoting *Brown*, 163 F.3d at 710).

The keystone of the analysis lies in the "general principle that any . . . plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

## IV. Application of Law to Facts

### A. *Release Agreements*

■ The July Agreement provided for the final settlement of "any and all claims that Erdreich or the Union has or may otherwise bring *regarding this matter*"— the "matter" being Erdreich's suspension for insubordination. App. B ¶ 3 (emphasis added). By its plain terms, the waiver cannot bar Erdreich's independent age discrimination claims that are the subject of this suit.

■ The language in the April Agreement, purporting to settle "any and all claims or grievances that have been or could be filed on Erdreich's behalf," App. A ¶ 2, requires greater scrutiny. The general scope of the release arguably precludes any discrimination claim Erdreich had in April 2008, soon after all events relevant to the alleged failure-to-promote and wrongful demotion occurred. Yet, the

circumstances of the agreement's execution and the additional term providing that the "settlement is without precedent to *any other claim or grievance of a similar nature and is not to be cited or referred to in any proceeding except a proceeding to enforce its terms*" injects a level of ambiguity as to the scope of the waiver's intended preclusive effect. *Id.* ¶ 4 (emphasis added).

Cases applying the "clear and unambiguous" standard have enforced waivers that were considerably more explicit with respect to the scope of the release of claims. For example, a plaintiff was barred from bringing a discrimination and harassment suit based on the following detailed waiver:

> [Plaintiff employee] releases and forever discharges [defendant] from any and all claims, debts, damages[,] financial obligations, and suits at law or in equity *of every kind or nature, whether known or unknown*, which he/she has or in the future may have, in connection with his/her employment by [defendant employer], or the termination of that employment. The released claims include but are not limited to all claims for breach of contract, wrongful discharge, impairment of economic opportunity, intentional infliction of emotional harm or other tort, or employment discrimination under every applicable federal, state or local law.

*Lambertson*, 50 F.Supp.2d at 165–66 (emphasis added). Such specific and detailed language exemplifies the clarity that a comprehensive release should possess.

In the present case, Erdreich agreed to waive "any and all claims or grievances that have been or could be filed," without further reference to the scope of the release. This waiver lacks the necessary specificity and precision required by New York law. The agreement stemmed from a union-related overtime dispute rather

than formal legal action; its context calls into question whether "any and all claims or grievances" refers to those disputes handled through the union or in a court. Evaluating the employer-employee relationship realistically, Erdreich could have been confused or unsure about whether the terms of the April Agreement barred all claims of any kind or only those "of a similar nature" to the pending overtime dispute.

A waiver of the nature and scope suggested by The Times cannot be found, in context, to have been agreed to knowingly and voluntarily by Erdreich. He had attended some college and, with three decades of professional experience at The Times, had some knowledge of the company's employment practices. But with respect to the agreement itself, Erdreich credibly asserts that he was unable to negotiate its terms, was unrepresented by counsel at the time of the waiver's execution, was not advised to consult with an attorney, and possessed the document for "no more than thirty second before being compelled to sign it." Erdreich Decl. ¶ 12.

Given the ambiguous language of the agreement and the context in which it was executed, it cannot be said to constitute a clear and unambiguous waiver, executed knowingly and voluntarily. It does not bar Erdreich's age discrimination claim. *See Golden Pac. Bancorp*, 273 F.3d at 515; *Skluth*, 163 A.D.2d at 106, 559 N.Y.S.2d 280.

### B. *Failure to Establish a Prima Facie Case of Discrimination*

#### 1. *Adverse Employment Action Is Material Issue of Fact*

 There is a material issue of fact with respect to whether denial of a "promotion" to the two delivery foreman positions was an "adverse employment action." *See Beyer v. County of Nassau*, 524 F.3d 160, 163–64 (2d Cir.2008). A factual determination of whether the alleged employment action was "sufficiently disadvantageous to constitute an adverse employment action" is necessary. *Id.* at 163. Required is an analysis that may include "demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (internal quotation marks omitted).

Beebe had lost his previous position due to organizational restructuring. He had considerable experience and expertise in fleet safety. Erdreich had expressed interest in fleet safety-related work, completing several courses and acquiring practical experience including accident training and pre-trip and post-trip inspections. Both claim that the publicized positions would have provided them with added fleet safety responsibilities, allowed them to utilize their training and professional experience, and supplied greater job security, potentially helping them to avoid the February 2008 demotions.

The job description for the promotions at issue provided that the worker would "be required to administer discipline, make recommendations concerning hiring and dismissal, and support the companies['] driver training and fleet safety programs," Answer, Ex. A, responsibilities not included in the written description of the jobs then held by plaintiffs. *See* Def.'s Letter, dated Sept. 4, 2009, Exs. A and B. Given the training and professional experience of plaintiffs and their concerns about relative job security, a jury might find that "the sought for position[s] [were] materially more advantageous than [plaintiffs'] current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Beyer*, 524 F.3d at 165.

Summary judgment is not warranted on this ground.

## 2. Specific Application Requirement Is Not Satisfied or Excused

 Summary judgment is appropriate on the ground that plaintiffs cannot establish a prima facie case. They failed to apply for the positions at issue despite the fact that a fully descriptive job posting was provided and read by each of them.

The second element of a prima facie case of discrimination requires a plaintiff to show that he was qualified for *a position that he applied for* and which was denied to him. *See Brown,* 163 F.3d at 709 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817); Part III.E, *supra.* Plaintiffs have provided no basis for being excused from this specific application requirement.

The job posting expressly stated that the new position would require the individual in that position "to administer discipline, make recommendations concerning hiring and dismissal, and support the companies['] driver training and fleet safety programs." Answer, Ex. A. These responsibilities are absent from the earlier job postings associated with the positions held by plaintiffs. *See* Def. Letter, dated Sept. 4, 2009, Exs. A and B; Parts II.A and B, *supra.* The earlier postings are significant not because they demonstrate that plaintiffs performed no fleet-safety-related duties in their foreman positions, but because the explicit differences between their own job descriptions and the January 2007 posting put them on notice that the new positions entailed substantial fleet-safety responsibilities. Plaintiffs were informed by the posted notice of the new position's fleet-safety aspect and of other duties that were not included in their own job descriptions.

Plaintiffs, as matter of law, must be deemed to have been aware that the posting was for a position that might have provided them with additional duties, and thus protection against downsizing and demotion. The fact that they may have incidentally performed duties within the formal responsibilities of those holding the new positions did not conflate the two jobs.

The different language contained in the posting compared with that included in the promotion announcement, which provided additional details about fleet safety duties, does not excuse plaintiffs' failure to apply for the position. It was adequately described in the posting by The Times and observed by both plaintiffs. They could have inquired as to the specific fleet safety responsibilities that were referenced in the posting. Plaintiffs' interest in fleet safety-related work and stated concerns about job security provided ample reason for them to seek additional information if they thought they needed it, and to submit an application.

 Relaxation of the application requirement may be appropriate under specific circumstances, such as where "the hiring process itself ... is implicated in the discrimination claim or is otherwise suspect." *E.E.O.C. v. Metal Serv. Co.,* 892 F.2d 341, 349 (3d Cir.1990); *see also Box v. A & P Tea Co.,* 772 F.2d 1372, 1376–77 (7th Cir.1985) (holding that where employer had no system to ensure all interested applicants could apply, no formal applications were sought and job openings were not posted, "the plaintiff can establish the application element of the prima facie case by showing that, had she known of ... [the] opening, she would have applied"). No case has been cited in which a plaintiff employee has been excused from the specific application requirement in circumstances similar to those in the instant case, where plaintiffs argue that a job posting was provided but did not provide sufficient detail.

The exception to the specific application requirement is narrow and inapplicable.

Plaintiffs' failure to apply for the promotion they claim to have been denied supports the grant of summary judgment to The Times.

### 3. No Basis for Improper Demotion Claim

 Plaintiffs do not allege, and the court does not find, that the facts of the February 2008 "demotions" of Beebe and Erdreich to journeyman independently establish a prima facie case of age discrimination. The changes in jobs were the consequence of The Times' legitimate business decision to reorganize its employment structure, based upon the results of an objective evaluation completed by an outside consulting firm.

There is no point in an amended complaint alleging discrimination with respect to plaintiffs' assignment to the position of journeyman. No evidence suggesting discriminatory conduct has been presented. In any event, the insufficiency of plaintiffs' failure-to-promote claims requires dismissal of all claims predicated upon failure to promote, including those relating to improper demotion.

## V. Conclusion

Defendant's motion for summary judgment is granted. No costs or disbursements are awarded.

SO ORDERED.

# Appendix A: April 2008 Agreement

Apr 02 08 04:4.7p NYT

182817147 p.1

**The New York Times**
840 EIGHTH AVENUE
NEW YORK N.Y. 10018

ANDREW GUTTERMAN
Executive Director
Labor Relations

Tel: 212 556-4091
Fax: 845-426-8141
E-mail: gutterm@nytimes.com

April 1, 2008

Mr. Glenn LaChance
Business Agent
Newspaper and Mail Deliverers Union
 of New York and Vicinity
24-16 Bridge Plaza South, Room 306
Long Island City, NY 11101

> Re: Erdreich Grievance Settlement

Dear Mr. LaChance:

This will confirm our agreement concerning the settlement of the Union's March 5, 2008 grievance concerning Bruce Erdreich's claim to an overtime guarantee.

1. Effective Sunday night, April 6, 2008, Erdreich, as the most senior bidder, shall be awarded the Carlstadt/Open five (5) night job set forth in the parties' April 1, 2008 letter agreement. In addition to the three (3) hour overtime flat associated with that job, Erdreich shall also receive one hour of Sherman Greene overtime for each shift he works.

2. Erdreich and the Union agree that the foregoing fully and finally settles any and all claims or grievances that have been or could be filed on Erdreich's behalf.

3. Erdreich represents that he has read this agreement carefully, that he fully understands its terms and their significance; and that he enters into this agreement knowingly and voluntarily. Erdreich also acknowledges that the Union has met all of its obligations with respect to its duty of fair representation in regard to this matter and hereby waives any of his rights relating thereto.

4. The parties also agree that this settlement is without precedent to any other claim or grievance of a similar nature and

339

Mr. LaChance
Page 2
April 2, 2008

is not to be cited or referred to in any proceeding except a
proceeding to enforce its terms.

Very truly yours,

ACCEPTED AND AGREED:

Glenn LaChance

ACCEPTED AND AGREED:

Bruce Erdreich

cc: M. Coleman
 J. Baker
 J. Watson

**Appendix B: July 2008 Agreement**
 —Continued

# Appendix B: July 2008 Agreement

**The New York Times**
620 EIGHTH AVENUE
NEW YORK, N.Y. 10018

ANDREW GUTTERMAN
Executive Director
Labor Relations

Tel: 212 556-4099
Fax: 212 556-5001
E-mail: gutman@nytimes.com

July 7, 2008

Mr. Glenn LaChance
Business Agent
Newspaper and Mail Deliverers' Union
of New York and Vicinity
24-16 Bridge Plaza South, Room 306
Long Island City, NY 11101

Re: <u>Bruce Erdreich</u>

Dear Mr. LaChance:

 This letter sets forth the terms and conditions of the return to employment of Mr. Bruce Erdreich ("Erdreich"). As you know, Erdreich is currently suspended indefinitely from the employ of the New York Times ("The Times") for insubordination. The Times and the Newspaper and Mail Deliverers' Union of New York and Vicinity ("Union") agree that Erdreich will be subjected to a suspension from work for a period of 30 calendar days, subject to the following conditions:

1. Erdreich shall be required to serve the first 15 days of his 30 day suspension immediately. Following the initial 15 day suspension, Erdreich shall be permitted to return to work, and the remaining 15 days of his suspension shall be held in abeyance for a period of 12 months commencing with the first day of his return to work. If, during that 12 month period, Erdreich has no incidents of insubordination, failure to comply with the orders of a Foreman, or any other infractions of Delivery Department Rules, the 30 day suspension shall be reduced to the 15 days suspension served, and Erdreich shall be permitted to return to work on July 13, 2008. If, however, during that 12 month period, Erdreich is insubordinate, fails to follow the orders of

## Appendix B: July 2008 Agreement
### —Continued

Mr. Glenn LaChance
Page 2
July 7, 2008

a Foreman or violates any Delivery Department Rules, Erdreich will be required to actually serve the remaining 15 day suspension in addition to any discipline that may be assessed for the infraction(s) that initiated the second 15 day suspension.

2. Erdreich represents that he has read this agreement carefully; that he fully understands its terms and their significance; that he intends to abide by the agreement; and that he enters into this agreement knowingly and voluntarily. Erdreich acknowledges that the Union has fairly represented him in this matter.

3. Erdreich and the Union acknowledge and agree that this agreement completely and fully resolves any and all claims that Erdreich or the Union has or may otherwise bring regarding this matter.

4. This agreement shall not constitute a precedent or past practice and may not be cited or referred to for any purpose in any future proceeding except a proceeding for enforcement of this agreement or a proceeding involving Erdreich.

Please indicate your concurrence by affixing your signature in the space provided below.

Very truly yours,

I concur:

Glenn LaChance

I concur:

Bruce Erdreich