*80 CALABRESI, Circuit Judge,
concurring:
I join the majority opinion because I agree with the result it reaches in this case and also with its reasoning,[1] as far as it goes. Specifically, I concur with the majority opinion’s two principal holdings: (1) that the only discriminatory conduct that McGullam alleges occurred within the limitations period (ie., the comments she overheard by a salesman who referred to women as “chickies,” and who said of a female friend that “she wasn’t worth the trip” “[i]f it wasn’t going to be a sleep-over”) is insufficiently related to prior alleged discriminatory conduct to be considered part of the same “unlawful employment practice” under 42 U.S.C. § 2000e-5(e)(1) and National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); and (2) that the within-limitations-period comments were neither sufficiently severe nor pervasive enough to establish liability under Title VII.
I write separately, however, to explain my views on the relevance, for the purposes of proving a hostile work environment claim, of discriminatory incidents from outside the limitations period. First, in determining whether incidents and episodes are sufficiently related to constitute a single discriminatory employment practice under Morgan, I would consider multiple factors — including the severity of earlier incidents — as part of a totality of the circumstances analysis. The majority opinion implicitly identifies certain factors with which I agree, but my approach requires that I address additional issues that the majority does not consider. Second, I believe that even where prior incidents are not part of the same discriminatory employment practice, and so are excluded by limitations requirements, they nevertheless may provide relevant background evidence to support a claim based on incidents that are within the limitations period. I discuss each issue in turn.
I.
A.
In Morgan, the Supreme Court explained that hostile work environment claims by “[t]heir very nature involved repeated conduct,” where liability often is based on “the cumulative effect of individual acts” that are not independently actionable. 536 U.S. at 115, 122 S.Ct. 2061. In contrast then to discrete acts of discrimination, a hostile work environment is an “unlawful employment practice” that takes place over time, rather than “on any particular day.” Id. An “employer may be liable for all acts that are part of this single claim,” provided that at least one act that is part of the hostile work environment took place within the applicable limitations period. Id. at 118, 122 S.Ct. 2061. “A court’s task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.” Id. at 120, 122 S.Ct. 2061.
What constitutes “the same actionable hostile work environment practice” is, however, hardly self-defining. And the Morgan Court’s guidance on this question is limited. See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1114 n. 6 (9th Cir. 2004) (“Morgan itself does not offer precise guidance on how to evaluate whether an act that falls outside the statutory time period can nonetheless be considered for liability purposes.”). In providing illustrations to explain its holding — which the ma *81 jority has quoted in full, see Maj. Op. at 75-76 — Morgan suggested that later incidents will be considered distinct, if they have “no relation” to the earlier acts from outside the period, or if “for some other reason, such as certain intervening action by the employer,” the later acts are no longer part of the same hostile environment claim. 536 U.S. at 118, 122 S.Ct. 2061. In addition, Morgan appeared to endorse the reasoning of the Ninth Circuit Court of Appeals that the pre- and post-limitations incidents were, in that case, part of the same violation because they “ ‘involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.’ ” Id. at 120, 122 S.Ct. 2061 (quoting Morgan v. Nat’l R.R. Passenger Corp., 232 F.3d 1008, 1017 (9th Cir.2000)); see also Vickers v. Poivell, 493 F.3d 186, 199 (D.C.Cir.2007) (indicating that the Supreme Court in Morgan gave some direction for determining whether employee complaints are part of the same actionable hostile work environment practice “by approving the lower court’s method”).
From these tea leaves, circuit courts subsequently have attempted to identify— sometimes explicitly, sometimes implicitly' — various factors that should guide the Morgan “relatedness” inquiry.[2] For its part, the majority opinion seeks to avoid setting forth general criteria in the interest of preserving “flexibility” for “a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment.” Maj. Op. at 77. Even so, by specifying reasons as to why the “sleep-over comment” in this case is insufficiently related to prior conduct that occurred while McGullam worked in the production department at Cedar Graphics, the majority opinion does identify certain distinctions as material. Specifically, in distinguishing between the pre- and post-limitations period incidents, the majority opinion highlights: (1) that they were separated by an intervening action by the employer — McGullam’s voluntary transfer — and so took place while McGullam was working for different departments in different parts of the building; (2) that they were of a different nature, in that many of the pre-limitations period incidents involved lewd comments that were about McGullam personally and were addressed to her or at least intended for her to hear, whereas the post-limitations comments were not (in the view of the majority opinion) lewd and were not directed toward McGullam; and (3) that they were separated by a significant amount of time.
I agree that all of these reasons given by the majority — the commonality of the environment in which the incidents took place (and whether a change in environment is due to intervening action by the employer), the nature of the incidents, and the temporal discontinuity between the in *82 cidents — are significantly relevant to assessing whether incidents are part of the same hostile environment claim. I also find helpful some factors that other circuits have attempted to glean from Morgan. See supra note 1. It is, however, important to appreciate that these considerations are not exhaustive, and that none of them should be considered independently in deciding whether, in any given case, the connection necessary to establish a single hostile work environment exists.
Temporal discontinuity, for instance, clearly does not by itself preclude a finding of relatedness under Morgan, 536 U.S. at 118, 122 S.Ct. 2061, a point that the majority properly recognizes. See Maj. Op. at 79. Similarly, McGullam’s transfer to a different department in a different sector of the building is not alone fatal to an argument that the conduct she experienced was part of a single hostile work environment. If, for example, a plaintiff provided evidence tending to show that an entire company, including multiple departments, was permeated with gender-based discriminatory intimidation, ridicule, and insult, and that upper-level management knew of and tolerated this condition, that plaintiff would quite likely be able to establish that the harassment she endured while working in two different departments for that company was part of the same unlawful employment practice. See Isaacs v. Hill’s Pet Nutrition, Inc., 485 F.3d 383, 386 (7th Cir.2007) (concluding that the plaintiff had alleged a single hostile work environment claim notwithstanding her change in job assignment — which resulted in her working under new leaders and in a different part of a packaging plant — and that the change in the identity of her harassers was not significant because her Title VII claim was against management for failure to respond to her repeated complaints about her work environment, not against her co-workers).[3]
I do not read the majority opinion as being to the contrary. And the fact that the majority opinion focuses on certain significantly salient differences, between the timely claims and the earlier incidents, to resolve this case need not be read as expressing a view either on the scope of the universe of possibly relevant factors that go into determining relatedness or on the weight any particular factor should be given. In that regard, the majority opinion’s approach is much like that of the Supreme Court in Morgan, which, after noting some important similarities between the pre- and post-limitations period incidents, concluded simply that it could not say that the pre-limitations incidents were “not part of the same actionable hostile environment claim.” 536 U.S. at 121, 122 S.Ct. 2061.
It seems to me that what courts are doing without necessarily saying so — and indeed what they should be doing — is considering whether, based on the totality of the circumstances, different incidents are part of the same underlying hostile work environment, both from the viewpoint of the plaintiff and from that of a reasonable person in her position. This is, after all, precisely what courts do in deciding the connected question of whether a work en *83 vironment is, or is not, discriminatorily hostile under Title VII. See Morgan, 536 U.S. at 116, 122 S.Ct. 2061 (“In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” (internal quotation marks omitted)); Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (“[Wjhether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.”); Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (indicating that to establish a hostile work environment claim, a plaintiff must show both that she subjectively perceived the environment as abusive and that the environment was objectively abusive, and explaining that a court must analyze these questions by “look[ing] to the record as a whole and assessing] the totality of the circumstances”).
These factors routinely are used to determine whether the combined effect of various discriminatory incidents is sufficiently severe or pervasive to cause an employee to believe reasonably that her work conditions have been negatively altered — that is, whether a hostile work environment existed. See Aulicino v. N.Y. City Dep’t of Homeless Servs., 580 F.3d 73, 82 & n. 8 (2d Cir.2009). But the same factors not only determine whether a person reasonably believes that individual incidents are severe or pervasive enough to amount to discrimination; they also affect whether the incidents are properly viewed as an interrelated part of a course of discriminatory conduct, or are just unpleasant but unconnected events. For instance, frequent discriminatory incidents are more likely, a) to constitute a single employment practice — because a reasonable person will generally consider incidents that are close in time to be connected — and b) to amount to discrimination that is sufficiently pervasive to state a claim under Title VII. Unsurprisingly then, “frequency” has been identified as a significant factor both for determining whether a work environment is unlawfully hostile, see Harris, 510 U.S. at 23, 114 S.Ct. 367, and for deciding whether two periods of incidents are part of the same employment practice, see e.g., Duncan, 397 F.3d at 1309; Rowe, 381 F.3d at 781.
For the same reasons, I believe that the severity of alleged conduct affects whether that conduct should be considered “related” under Morgan. All other things being equal, incidents that occurred later in time are more likely to be part of the same hostile environment as pre-limitations period incidents when those earlier incidents were more severe. In this respect, consider both the subjective and objective relevance of severity. As to the plaintiff herself, the severity of the earlier statements seems clearly relevant to the question of linkage between incidents. After all, how one reacts subjectively to a later statement — i.e., whether one perceives the statement to constitute part of the same employment practice as prior statements and incidents — certainly depends on the nature, including the severity, of the earlier conduct. Moreover, an objective observer in the plaintiffs position would, I think, consider the relative severity of earlier incidents relevant to her assessment of whether later incidents were related. Where, for example, an individual previ *84 ously experienced severe harassment, whether in the form of humiliating or obscene comments or even physical threats, a reasonable person is more likely to deem later comments and actions, even if milder, to be part of a pattern than if the earlier episodes were comparatively benign. This is especially likely when the same person or group of people is the source of both the earlier and later incidents. But even where the source is not common, earlier occurrences of severe hostility in the workplace may reasonably color one’s interpretation of later events and hence whether those events are related.
B.
Adopting this approach, which bases relatedness on the totality of the circumstances including the severity of alleged conduct, requires me to discuss an issue that the majority does not reach: the pervasiveness and severity of the pre-limitations-period conduct that McGullam asserted she endured while working in the production department. In my judgment, the conduct that McGullam alleged during this approximately three-year period would be sufficient, under our cases, to allow a reasonable jury to conclude that McGullam’s workplace was “permeated with discriminatory intimidation, ridicule, and insult,” causing her employment to be altered for the worse because of her gender. E.g., Gorzynski, 596 F.3d at 102; Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir.2003).[4] The majority sets forth most of the comments and actions that were personally directed at McGullam, and I need not repeat them here. See Maj. Op. at 73. In addition, McGullam claims that she witnessed and overheard comments and displays while in the production department that were sexually offensive and demeaning to women generally, including:
a) a comment by a male manager to another male manager that an (unidentified) woman was “well endowed” and had “double D’s”; b) a conversation between McGullam and two male co-workers about a client account McGullam had inherited, where one of the co-workers referred to the contact for that client as “generally a nice lady, except when she’s on the rag”; c) comments by the male plant manager and other male employees about a female employee at a sister company, with several employees speculating that the female employee was “probably ‘a dog’ ” and the manager responding to the contrary that she was “probably beautiful” because “[ajfter all, the bitchier they are, the prettier they are”; d) a male employee “openly” and “constantly” “scratching and adjusting his genitals”; e) a male employee using the phrase “titty bar”; and f) repeated sexually explicit jokes by a particular male employee who every year at Christmas time performed a modified (and sexualized) version of the song “Oh Come All Ye Faithful” while “strokfing] ... a large, imaginary penis,” and who on another occasion told a joke about having sexual relations with a 7-year-old girlfriend.
These incidents, and those described by the majority, are not exhaustive of McGullam’s allegations.
*85 In concluding that McGullam failed to establish a claim for hostile work environment, the district court referred to plaintiffs allegations as amounting to “off-hand remarks” and “jokes” that, though they “may have made Plaintiff uncomfortable,” were “not personally insulting, nor ... obviously intended to intimidate, ridicule, or demean Plaintiff on account of her gender.” See McGullam v. Cedar Graphics, Inc., No. 04-CV-2891, 2008 WL 3887604, at *7 (E.D.N.Y. Aug. 20, 2008).[5] I do not believe the record, viewed in its totality, supports this conclusion. McGullam points to several incidents that were personally insulting and intended to intimidate, ridicule or demean her, including the comment — made in front of the entire production department — that her “problem” was that she did not “get fucked enough,” the comment by a male co-worker that she had a “big fat ass,” as well as the “joke” by a male co-worker who said that he wanted “to pump a bullet into [McGullam’s] head, right behind [her] ear and blow [her] brains out.”
Moreover, these incidents must be considered alongside the other comments, only some of which I mentioned above, that were not directed to or about MeGullam, but also contributed to a work environment that was hostile to women. See Patane v. Clark, 508 F.3d 106, 114 (2d Cir.2007) (“[A] plaintiff need only allege that she suffered a hostile work environment because of her gender, not that all of the offensive conduct was specifically aimed at her.”). The district court minimized these statements, claiming that there was “nothing in the record to indicate that the alleged conduct was made on the basis of gender,” and that “[a]t best, the evidence here demonstrates that the work environment was equally unprofessional for both men and women.” McGullam, 2008 WL 3887604, at *7. This was error.
Certainly, plaintiff, who proceeded pro se in this litigation, made multiple allegations about workplace vulgarity and poor manners that are not actionable under Title VII. See Oncale v. Sundowner Offshore Seros., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). But many of the comments that McGullam asserts she overheard — including references to one woman as a “dog” and as “bitch[y],” to another woman as being “on the rag,” and more generically to a “titty bar” — have obvious gender connotations that a person in plaintiffs position reasonably could understand to be particularly demeaning to women as a group. That this sexually derogatory language was not always directed specifically at McGullam or even necessarily at individual women, and rather appears to be the product of a locker-room office culture that both men and women observed (and in which some women even participated) does not insulate Cedar Graphics from a Title VII hostile work environment claim. See Petrosino v. Bell Atl., 385 F.3d 210, 221-23 (2d Cir.2004) (explaining that “[t]he mere fact that men and women are both exposed to the same offensive circumstances on the job site ... does not mean that, as a matter of law, their work conditions are necessarily equally harsh” where a jury could reasonably find that certain offensive comments and materials were particularly offensive to women); see also Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir.2010) (en banc) (“[A] member of a protected group cannot be forced to endure pervasive, derogatory conduct and references that are gender-specific in the workplace, just because the workplace may be otherwise rife with gen *86 erally indiscriminate vulgar conduct. Title VII does not offer boorish employers a free pass to discriminate against their employees specifically on account of gender just because they have tolerated pervasive but indiscriminate profanity as well.”).
C.
The severity of this pre-limitations period conduct pushes in the direction of finding a single hostile work environment at Cedar Graphics that persisted through McGullam’s transfer to the estimating department and extended into the actionable limitations period. A person in McGullam’s position, who had previously worked in an office where degrading discussion of women was pervasive and tolerated might understandably construe a salesman’s subsequent references to women as “chickies” and his discussion of a girlfriend as not being “worth the trip” if she did not sleep with him as a continuation of the same hostile environment.
Nevertheless, I am ultimately persuaded that, based on the totality of circumstances, these later comments were not part of the same employment practice as the earlier incidents that took place in the production department. The majority properly emphasizes the significance of McGullam’s voluntary transfer out of the production department in this case, because that transfer physically separated her from the atmosphere that had been hostile to her and limited (albeit without completely eliminating) her interaction with the employees from that department. McGullam indicated, in both her deposition testimony and in her journal, that the environment in the estimating department was “better,” and, as the majority notes, she pointed to no problems with anyone in the estimating department. For these reasons, and for others stated in the majority opinion, I do not believe that the salesman’s isolated comments that McGullam overheard approximately a year after her transfer can be considered part of the same employment practice as the harassment from McGullam’s time in the production department. As a result, I agree that the earlier harassment was outside the statute of limitations period and, hence, non-actionable.
II.
Even where incidents from outside of the limitations period are not sufficiently related to within-limitations incidents to be actionable under Morgan, they may still be germane to a plaintiffs Title VII claim in a different way. In Morgan, the Court held that, in contrast to hostile work environment claims, discrete acts of alleged discrimination, such as termination, failure to promote, or refusal to hire, are not actionable if time barred. 536 U.S. at 113, 122 S.Ct. 2061. But, the Court added, this does not “bar an employee from using the prior acts as background evidence in support of a timely claim.” Id.; see also Petrosino, 385 F.3d at 220 (recognizing that plaintiffs claims based on earlier promotion denials were time barred, but determining that “evidence of earlier promotion denials may constitute relevant background evidence in support of a timely claim” and would be so considered (internal quotation marks omitted)). Similarly, alleged incidents that may not be considered for purposes of establishing liability for a hostile work environment, because they occurred outside the limitations period and were not sufficiently related to incidents within that period, nevertheless may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period. See McGinest, 360 F.3d at 1114 n. 6 (endorsing this reading of Morgan). It is, therefore, a mistake to *87 assume that incidents that are unrelated under the Morgan standard are irrelevant. But see id. at 1128 (O’Seannlain, J., concurring in part and dissenting in part).
The meaning of words and actions in the workplace frequently cannot be judged in a vacuum; their meaning may well depend on context. See Oneale, 523 U.S. at 81-82, 118 S.Ct. 998 (“The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.”). Prior incidents, even if they are not part of the same employment practice, can provide such context. Thus, whether an objective observer would consider comments to have gender-discriminatory (or racially discriminatory) connotations, or to be intended to further a pattern of gender or racial discrimination, will not always be obvious, and may depend on circumstantial evidence. Cf. Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir.2008) (recognizing that direct evidence of discriminatory intent in employment discrimination cases is generally hard to come by, and that plaintiffs must be able to rely on circumstantial evidence). Evidence that similar comments have previously been used by the same individual (or perhaps by others in the company) to harass on the basis of race or gender might well be relevant to how the later comments reasonably could be interpreted. And, significantly, that will be so even if the comments are not part of the same unlawful employment practice under Morgan because, for instance, the comments are separated by an important intervening action by the employer and by a substantial amount of time.
In this respect, the severity of prior time-barred incidents may also be relevant as background evidence. Subjectively, a female plaintiff who has previously experienced an extremely hostile work environment is more likely to perceive subsequent discriminatory incidents — that, let us assume, take place in a different department within the company, under different managers, and after some gap in time — to create an environment that is hostile to women. Similarly, the severity of such prior incidents is also relevant to an objective observer’s assessment of the latter environment. Objective judgment may more readily discount the earlier severe hostility, but at least in some circumstances, such severe hostility may still be determinative.
Ultimately, I do not think that in the case before us the pre-limitations conduct affects the result. Even if the production department conduct is considered as background evidence, and is deemed as severe as I take it to be, the “sleep-over comment” (whether or not it is combined with the “chickies” comments) is not adequate to survive summary judgment. In other cases, however, evidence from outside the limitations period pertaining to conduct that is no longer actionable might well make a difference in establishing the validity of a plaintiffs timely claims.

. I do not join footnote five, which I believe misunderstands the point I am making.

. See, e.g., Stewart v. Miss. Transp. Comm’n, 586 F.3d 321, 329 (5th Cir.2009) (finding pre- and post-limitations conduct sufficiently related to constitute a single “practice” because "[a]s in Morgan, the pre- and post-limitations period incidents involved the same type of harassment and were perpetrated by the same manager,” but nevertheless concluding that the two periods of harassment were severed by the employer’s intervening remedial actions); Duncan v. Manager, Dep't. of Safety, City & County of Denver, 397 F.3d 1300, 1309 (10th Cir.2005) ("To determine whether these acts are part of the same hostile work environment, Morgan advises looking at the type of these acts, the frequency of the acts, and the perpetrator of the acts.”); Rowe v. Hussmann Corp., 381 F.3d 775, 781 (8th Cir.2004) (”[W]e conclude as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action.”).

. When the intervening action by the employer was undertaken in an attempt to remedy the negative work environment, it might, of course, have greater independent legal significance. See Stewart, 586 F.3d at 329 (finding that two periods of alleged harassment were separated by intervening action by the employer in the form of prompt remedial action where the employer reprimanded the harassing supervisor and reassigned the plaintiff away from his supervision). Cedar Graphics does not contend that there was such a remedial purpose underlying McGullam’s transfer. The transfer was apparently initiated by McGullam and presented by her to the company as a positive career opportunity.

. I do not address the question of whether the alleged harassing conduct that formed the basis of a hostile workplace can be imputed to Cedar Graphics, though on this issue it is notable both that McGullam claims to have made numerous complaints to supervisors about the work environment and that such complaints were generally "fruitless,” and also that McGullam implicates managers in the production department in some of the discriminatory conduct. See Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir.1998) (explaining the ways that liability for a hostile work environment can be imputed to an employer).

. The district court did not question that McGullam subjectively experienced her workplace as hostile, and on appeal Cedar Graphics has not challenged this.